AO 91 (Rev. 11/11)  Criminal Complaint

**COPY**

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | Case No.  19 MJ05111 |
| CRUZ NOEL QUINTERO, | |
| Defendant | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 17, 2019, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(o) | Possession of machineguns |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Douglas E. McCarty, SA HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  12/3/19

City and state:  Los Angeles, California

_____
*Judge's signature*
MICHAEL R. WILNER

MICHAEL R. WILNER
*Printed name and title*

AUSA: Ian V. Yanniello x3667

**AFFIDAVIT**

I, Douglas E. McCarty, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal and arrest warrants for CRUZ NOEL QUINTERO ("QUINTERO") for a violation of Title 18, United States Code, Section 922(o) (Possession of Machineguns).

2.    This affidavit is also made in support of an application for a warrant to search six digital devices (collectively, the "SUBJECT DEVICES") seized by the Long Beach Police Department ("LBPD") on May 16, 2019 (SUBJECT DEVICES 1 and 2) and May 17, 2019 (SUBJECT DEVICES 3-6), as described more fully in Attachment A, which is incorporated herein by reference, for evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance), 856 (Maintaining a premises for drug activities), and 846 (Conspiracy to Distribute a Controlled Substance); Title 18, United States Code, Sections 922(o) (Possession of Machineguns) and 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime); and Title 26, United States Code, Section 5861(d) (Possession of Illegal Short-Barreled Rifles) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    Since June 2010, I have been employed as a Special Agent ("SA") with the United States Department of Homeland Security, U.S. Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") in Los Angeles, California.  I have participated in numerous investigations involving violations of federal fraud, firearms, and narcotics trafficking laws and I have participated in the execution of numerous arrest and search warrants.  Before becoming an SA, I received formal training at the HSI Academy in Glynco, Georgia, where I successfully completed the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training Program.  I have a Bachelor of Arts degree in Psychology from California State University, Long Beach.

## III. SUMMARY OF PROBABLE CAUSE

5.    On May 16, 2019, in Long Beach, California, victim S.F. died after consuming fentanyl.  A witness identified

QUINTERO as the drug dealer who provided the drugs to S.F. and text messages corroborate that QUINTERO was the source of S.F.'s fentanyl.  On May 17, 2019, the Long Beach Police Department ("LBPD") executed state search warrants on two residences connected to QUINTERO and found, among other things, two machineguns, three assault-style rifles with barrels that measured less than 16 inches, other firearms, digital scales, plastic baggies, and substances commonly used to dilute controlled substances.  In a post-Miranda interview, QUINTERO admitted the firearms belonged to him.  QUINTERO does not have any firearm licenses permitting him to possess machineguns or short-barreled rifles.

### IV. STATEMENT OF PROBABLE CAUSE

6.     Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.  QUINTERO Sold S.F.'s Fiancée Drugs the Night Before S.F.'s Drug Overdose Death

7.     On May 16, 2019, LBPD detectives began an investigation into a suspected overdose death in Long Beach, California.  The decedent, S.F., was found nonresponsive and lying face up on the floor of S.F.'s living room.  Paramedics working for the Long Beach Fire Department pronounced S.F. dead at or around 2 p.m. on May 16, 2019.

8.     When LBPD officers arrived at S.F.'s residence, they found a white powdery substance on a countertop near the decedent's body.  Next to the white powder, officers found a

credit card with drug residue on it and a paper rolled into a straw.  The LBPD Crime Laboratory later analyzed the substance and determined it was approximately 2.692 grams of fentanyl. The Los Angeles County Department of Medical Examiner-Coroner conducted an autopsy and concluded that S.F.'s cause of death was fentanyl toxicity.

9.   LBPD officers and detectives investigated the source of the fentanyl that killed S.F.  Among other things, law enforcement officers interviewed the decedent's live-in fiancée, B.M., who told law enforcement the following:

a.   At approximately 11 a.m. on May 16, 2019, B.M. stated she and S.F. snorted the white powder -- which they believed was cocaine.  After B.M. consumed the drugs, she felt dizzy and immediately passed out in the bedroom.  B.M. woke up at approximately 1 p.m. and found S.F. lying on the ground nonresponsive.

b.   Law enforcement asked B.M. to provide information about the source of the drugs that she and S.F. consumed.  In response, B.M. stated that QUINTERO sold her the drugs the night before S.F.'s death.  Specifically, B.M. stated that on May 15, 2019, B.M. contacted QUINTERO to purchase $100 worth of cocaine. QUINTERO agreed to sell her the narcotics and then met B.M. in a restaurant parking lot around 11 p.m. or midnight.  B.M. stated that she was scared to disclose QUINTERO's identity because QUINTERO was "connected" and would hurt her if he found out she told law enforcement his name.  B.M. also stated that she and the decedent had previously purchased narcotics from QUINTERO.

B.M. also stated that QUINTERO's cell phone number is 310-505-2242.[1]

10.   LBPD detectives seized a black iPhone Model Xr, Serial No. FKIXL8XPKXKW, associated with the telephone number 760-887-4461, which B.M. stated was her cell phone ("SUBJECT DEVICE 1"). Law enforcement also seized a black iPhone, Model X, associated with the telephone number 714-342-6641, which B.M. confirmed was the decedent's cell phone ("SUBJECT DEVICE 2").

11.   LBPD obtained toll records related to SUBJECT DEVICE 1.  The toll records show that B.M. and QUINTERO exchanged approximately 17 text messages between 10:49 p.m. and 12:46 p.m. on May 15, 2019.

12.   On May 16, 2019, LBPD obtained a state warrant to search SUBJECT DEVICES 1 and 2.  Pursuant to the warrant, law enforcement reviewed text messages between B.M. and the decedent.  On the night of May 15, 2019 and into the morning of May 16, B.M. and the decedent exchanged messages about acquiring "coke" from "Cruz," QUINTERO's first name.  At approximately 12:55 a.m. on May 16, 2019, B.M. wrote "he said he's coming out [right now]."  B.M. then wrote "on my way," indicating she had received the drugs from QUINTERO.  Toll records show that QUINTERO and B.M. exchanged four text messages between 12:54 p.m. and 12:55 p.m.  After B.M. confirmed she was on her way, the decedent wrote: "I hope you didn't give him the full $100." B.M. replied, "I did" stating "It's Cruz."

_____

[1] In a post-Miranda interview, QUINTERO provided this same number for his cell phone, which was seized when LBPD arrested QUINTERO on May 17, 2019.

**B.    Law Enforcement Finds Machine Guns, Illegal Short-Barreled Rifles, Drugs, and SUBJECT DEVICES 3-6 in QUINTERO's Car and Residences**

13.    On May 17, 2019, LBPD obtained a state warrant to search two residences linked to QUINTERO: 160 E. 49th Street, Long Beach, California (the "49th Street Residence"); and 3030 Gale Avenue, Long Beach, California (the "Gale Residence").

    1.    LBPD Stop QUINTERO's Vehicle and Find a Loaded Gun and SUBJECT DEVICE 3

14.    Before executing the search warrants, LBPD officers saw QUINTERO standing in front of the Gale Residence.  QUINTERO then got into a Chevrolet SUV with a minor female, later identified as QUINTERO's daughter.  QUINTERO drove the SUV northbound on Gale Avenue.

15.    LBPD officers conducted a traffic stop of QUINTERO's SUV and placed him in handcuffs.  LBPD then advised QUINTERO about his Miranda rights, and QUINTERO waived his rights to speak with law enforcement officers.  Among other things, officers asked QUINTERO if he had any weapons inside the vehicle.  QUINTERO said yes, stating he had a gun located inside the center console.  Officers searched the car and found a loaded Glock, Model 27, Serial No. LYE919, .40 caliber semiautomatic handgun in the center console.  Law enforcement found QUINTERO's wallet and a Samsung Galaxy, Model Note 8, cell phone ("SUBJECT DEVICE 3") lying next to the firearm.

16.    LBPD later determined the Glock firearm had been stolen in or around Phoenix, Arizona.  Specifically, the owner of the weapon reported it stolen on or about June 30, 2016.

2.   **LBPD Found Multiple Assault Weapons Inside QUINTERO's Gale Residence and SUBJECT DEVICES 4-6**

17.   Pursuant to the search warrant, law enforcement searched the Gale Residence and found the following:

a.   a Wylde AR15-style semiautomatic rifle with an attached high capacity magazine located in the northeast bedroom closet.  The rifle had a barrel that measured 9.5 inches in length.  The rifle had one round of ammunition in the chamber, and 19 additional bullets in the magazine;

b.   a Mak-90 Sportster 7.62 rifle located in the southeast bedroom closet;

c.   six 30-round high capacity magazines located inside of a green bag inside the northeast bedroom; and

d.   three coolpad cellular telephones bearing recovered from the top of a dresser in the northeast bedroom near U.S. Mail addressed to QUINTERO ("SUBJECT DEVICES 4 through 6")  The corresponding serial numbers for SUBJECT DEVICES 4 THROUGH 6 are 863519030221977, 863519033993879, and 861325035236818.

3.   **Law Enforcement Found Illegal Firearms and Drugs Inside QUINTERO's 49th Street Residence**

18.   On May 17, 2019, law enforcement searched QUINTERO's 49th Street Residence pursuant to a warrant.  Law enforcement found the following inside the master bedroom:

a.   a blue bag found under the bed in the master bedroom containing: (1) an Uzi-type, 9 millimeter automatic

firearm;[2] (2) three loaded high capacity magazines for the Uzi-type weapon; (3) a Digiweigh digital scale; (4) numerous unused sandwich bags; and (5) a box of 7.62 caliber ammunition;

      b.    a AR15-style .223 caliber rifle, located inside the master bedroom's south closet;

      c.    two AR15-style rifles with no serial numbers, located inside the master bedroom's closet.  One of the rifles had a barrel that measured 9 inches in length; the other had a 10-inch barrel;

      d.    a SKS-style rifle, located inside the master bedroom's south closet;

      e.    a Mak-90 assault-style rifle, located inside the master bedroom's south closet;

      f.    QUINTERO's U.S. Passport and approximately $60,870 in U.S. Currency found inside the master bedroom's closet;

      g.    a Daewoo 9 millimeter semiautomatic handgun with a loaded magazine, located in the master bedroom's north closet;

      h.    a Hi-Point .40 caliber semiautomatic handgun, located in the master bedroom's north closet;

      i.    a AK47-style automatic rifle, located in the master bedroom's north closet;[3]

---

[2] On December 2, 2019, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") SA Ryan Catanzano tested this firearm and determined it functioned as a machinegun, as defined in 26 U.S.C. § 5845(b).

[3] On December 2, 2019, ATF SA Ryan Catanzano tested this firearm and determined it functioned as a machinegun, as defined in 26 U.S.C. § 5845(b).

    j.   a AR15-style "Ghost Gun" rifle with no serial number, located in the master bedroom's north closet;

    k.   a ballistic vest found in the master bedroom's north closet;

    l.   a Dymo model digital kilogram scale, located in the master bedroom's north closet;

    m.   four containers of MSN animal products commonly used as a narcotics "cutting" agent;

    n.   items and equipment used to package narcotics, including a pill press, a device for vacuum sealing plastic bags, and a roll of shrink wrap;

    o.   eight cell phones;[4]

    p.   various high-capacity magazines and boxes of ammunition; and

    q.   various drugs, including: approximately 1.132 grams of heroin; approximately 1.790 grams of methamphetamine; approximately 88 grams of marijuana; and approximately 445.1 grams of an off-white substance.[5]

---

[4] These devices are currently in the custody of the Drug Enforcement Agency ("DEA") in Minnesota. The DEA obtained a search warrant to search these devices in connection with an unrelated drug investigation involving QUINTERO shipping narcotics to Minnesota. The government is not relying on information provided by the DEA to establish probable cause in this affidavit. The government intends to seek a search warrant in Minnesota for these devices or a search warrant in the district if the devices are transferred back here.

[5] On December 2, 2019, lab tests confirmed the substance contained caffeine. Based on my training and experience, I understand that caffeine is a substance that can be used as a "cutting agent" to dilute controlled substances.

### C.   QUINTERO Admitted the Guns and Drugs in Both Residences Belonged to Him

19.   As noted above, LBPD detectives read QUINTERO his Miranda rights and QUINTERO waived his rights and agreed to speak with law enforcement.  QUINTERO stated he worked as an emergency medical technician ("EMT") for Long Beach Memorial Hospital.  QUINTERO told law enforcement that he occupied and resided at both the Gale Residence and the 49th Street Residence.  QUINTERO also told law enforcement that the weapons, money, and narcotics seized from the 49th Street and Gale Residences belonged to QUINTERO.  When asked if the narcotics seized from the 49th Street Residence was cocaine or fentanyl, QUINTERO stated he was not sure but it could be either. QUINTERO confirmed he knew about S.F.'s overdose death, but he refused to answer questions about whether he provided the fentanyl that killed S.F.

### D.   ATF Firearms Analysis

20.   On December 2, 2019, ATF SA Ryan Catanzano examined the firearms that LBPD seized from QUINTERO's residences.  As noted above, SA Catanzano confirmed that two assault-style weapons functioned as machineguns, as defined in 26 U.S.C. § 5845(b).

21.   During SA Catanzano's analysis of the seized weapons, he determined that three assault-style rifles had barrels that were less than 16 inches in length, namely barrels between 9 and ten inches long.

22.  On or about December 03, 2019, ATF conducted records checks of QUINTERO in the National Firearms Registration Transfer Record ("NFRTR") database.  The records checks revealed that QUINTERO was not listed in the NFRTR database.

23.  On or about December 03, 2019, ATF conducted a records check of QUINTERO in the ATF Federal Licensing System ("FLS") database.  The records check indicated that QUINTERO does not currently have and has never had a Federal Firearms License ("FFL").

24.  Based on my training and experience, and my conversation with ATF SA Catazano, I understand that QUINTERO thus cannot legally own machineguns or short-barreled rifles.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

25.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

26.   From my training, personal experience, and the collective experiences related to me by other law enforcement

officers who conduct firearms investigations, I am aware of the
following:

      a.   Persons who possess, purchase, or sell illegal
firearms or who have firearms in furtherance of drug trafficking
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that individuals who own illegal firearms or have
firearms in furtherance of drug trafficking will keep the
contact information of the individual who is supplying those
firearms for future purchases or referrals.  Such information is
also kept on digital devices.

      b.   Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

      c.   Those who possess illegal firearms or have
firearms in furtherance of drug trafficking often sell their
firearms and purchase firearms.  Correspondence between persons
buying and selling firearms often occurs over phone calls, e-
mail, text message, and social media message to and from
smartphones, laptops, or other digital devices.  This includes
sending photos of the firearm between the seller and the buyer,
as well as negotiation of price.  In my experience, individuals
who engage in street sales of firearms frequently use phone

calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the purchase or sale of illegal firearms or firearms in furtherance of drug trafficking and other contraband often use multiple digital devices.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

    27.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

    28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VIII.    CONCLUSION

31.  For all of the reasons described above, there is probable cause to believe that QUINTERO has committed a violation of 18 U.S.C. § 922(o): Possession of a machinegun. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

_____
Douglas E. McCarty, Special
Agent, Homeland Security
Investigations

Subscribed to and sworn before me
this 3rd day of December, 2019

MICHAEL R. WILNER

MICHAEL R. WILNER
_____
UNITED STATES MAGISTRATE JUDGE