UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:19-cr-00766(B)-CAS | | Date | August 30, 2022 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |

| CATHERINE JEANG | KATIE THIBODEAUX | DAVID LACHMAN SURIA BAHADUE |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant: | Present | Cust. | Bond | Attorneys for Defendant: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| CRUZ QUINTERO | X | X | | RICHARD ROWE | X | X | |
| | | | | ERICA CHOI | X | X | |

**Proceedings:**   ORDER ON DEFENDANT'S PRETRIAL MOTIONS (Dkts. 52, 53, 54, 61, 62, 63, 72, filed on June 21, 2022, August 8, 2022, and August 23, 2022)

## I.   INTRODUCTION

On December 3, 2019, a criminal complaint was filed against defendant Cruz Quintero for possession of machineguns, in violation of 18 U.S.C. § 922(o). Dkt. 1 at 1. On December 17, 2019, Quintero was charged in a four-count indictment with one count of possession of machineguns, in violation of 18 U.S.C. § 922(o)(1), and three counts of possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d). Dkt. 11 at 1-3. On June 24, 2020, the First Superseding Indictment was filed against Quintero, charging him with one count of distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c); one count of possession of machineguns, in violation of 18 U.S.C. § 922(o)(1); and three counts of possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d). Dkt. 30 at 1-3.

On June 21, 2022, Quintero filed three pretrial motions. The first motion seeks to sever the counts against him. Dkt. 52. The second motion seeks one hour per side of attorney-conducted *voir dire*. Dkt. 53. The third motion seeks to suppress statements and evidence collected by Long Beach Police Department ("LBPD") officers on May 17, 2019. Dkt. 54.

On July 27, 2022, the Second Superseding Indictment was filed against Quintero, charging him with one count of distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); one count of possession of machineguns, in violation of 18 U.S.C. § 922(o)(1); two counts of possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d); one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1); and one count of possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Dkt. 57 at 1-6.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**              **'O'**

On August 8, 2022, Quintero filed two motions *in limine*, dkts. 61, 62, and a renewed motion to sever counts, dkt. 63.  The first motion *in limine* seeks to exclude evidence from a Minnesota-based U.S. Drug Enforcement Administration ("DEA") investigation.  Dkt. 61.  The second motion *in limine* seeks to exclude the expert testimony of Agent Jason Gertler.  Dkt. 62.

On August 8, 2022, the government filed oppositions to defendant's motion to permit attorney-conducted *voir dire* and motion to suppress statements and evidence.  Dkts. 64, 65.  On August 15, 2022, Quintero filed replies in support of his motion to suppress statements and evidence and motion to permit attorney-conducted *voir dire*.  Dkts. 66, 67.  On August 22, 2022, the government filed oppositions to Quintero's renewed motion to sever counts, motion *in limine* to exclude expert testimony and motion *in limine* to exclude evidence from the DEA investigation.  Dkts. 68, 69, 70.  On August 26, 2022, the government filed a sur-reply in opposition to defendant's motion to suppress.  Dkt. 79.

On August 30, 2022, the Court held a hearing on defendant's motions and an evidentiary hearing on the question of whether defendant was given a <u>Miranda</u> warning.  At the hearing, the Court received into evidence a copy of a <u>Miranda</u> rights advisal card and a video recording taken during a search of one of defendant's residences.  Defendant and LBPD Detective Thue testified at the hearing.

Defendant's motion to suppress, motion to conduct attorney-led *voir dire* of one hour per side, motion to sever counts, motion *in limine* to exclude evidence from the DEA investigation, and motion *in limine* to exclude the expert testimony of Agent Gertler are presently before the Court.

## II.  BACKGROUND

On May 16, 2019, LBPD officers were dispatched to investigate the drug overdose death of S.F., who was found nonresponsive in his residence in Long Beach, California.  Dkt. 1 at 4.  The officers found a white powdery substance near S.F.'s body.  <u>Id.</u>  The LBPD officers spoke with S.F.'s fiancée B.M., who told the officers that, on the morning of S.F.'s death, she and S.F. had snorted white powder that they believed to be cocaine.  <u>Id.</u> at 5.  B.M. stated that, after consuming the drugs, she felt dizzy and passed out, and, when she woke up, she found S.F. lying on the ground nonresponsive.  <u>Id.</u>  When asked where she and S.F. obtained the drugs, B.M. told the officers that defendant Quintero had sold B.M. the drugs after B.M. contacted Quintero and asked to purchase $100 worth of cocaine.  <u>Id.</u>  B.M. reported that, the night before S.F.'s overdose, B.M. met Quintero in a restaurant parking lot, and Quintero sold her drugs that B.M. believed to be cocaine.  <u>Id.</u>  B.M. additionally stated that she, S.F., and Quintero were coworkers at Long Beach Memorial Hospital and that she and S.F. "used defendant to get their cocaine."  Thue Decl. ¶ 4.  The LBPD Crime Laboratory later determined the white powdery

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

substance found near S.F.'s body to be fentanyl, and an autopsy revealed that S.F.'s cause of death was fentanyl toxicity.  Dkt. 1 at 5.

LBPD officers seized B.M.'s and S.F.'s cell phones and obtained toll records related to B.M.'s cell phone, which showed that B.M. and Quintero exchanged text messages the night of May 15, 2019.  Id. at 6.  On May 16, 2019, LBPD obtained a state warrant to search the cell phones and reviewed text messages sent between B.M. and S.F. on the night of May 15, 2019, and early in the morning of May 16, 2019.  Id.  The text messages between B.M. and S.F. indicated that B.M. purchased "coke" from "Cruz," (Quintero's first name).  Id.  Toll records showed that B.M. and Quintero exchanged four text messages early in the morning of May 16, 2019.  Id.

On May 17, 2019, LBPD officers obtained a search warrant supported by a sworn affidavit submitted by LBPD officer Detective Thue, one of the LBPD officers dispatched to S.F.'s Long Beach residence to investigate his death.  See dkt. 65-1.  The affidavit states Detective Thue's past experience investigating drug trafficking, recounts his conversation with B.M., and additionally states that Detective Thue "learned after speaking with the DEA that Quintero is being indicted for shipping cocaine and possibly heroin to Minnesota."  Id. at 11, 14.  According to the affidavit, the DEA, also informed Detective Thue that Quintero "lived at 160 E. 49th Street and his family resides at 3030 Gale."  Id. at 14.  Detective Thue states in the affidavit that the LBPD Drug Investigation Section found that Quintero uses both addresses.  Id. Detective Thue further states that, based on his training and experience, "narcotic traffickers often live at one location and use another location to attempt to hide their narcotics," and that he believes "narcotics and other items related to narcotic sales" may be at either of the locations. Id.  Additionally, Detective Thue expressed fear that Quintero had access to fentanyl due to his employment at Long Beach Memorial Hospital, and that he was selling as cocaine drugs that were actually heroin or fentanyl.  Id.  The affidavit requested a search warrant for 3030 Gale, ("Gale Avenue residence"), and 160 E. 49th Street, ("49th Street residence"), and asked for nighttime service of the warrant, citing crime and gang activity in both areas and concerns that subjects may warn occupants of the officers' search, "thus giving the occupants(s) time to discard narcotics and or arm themselves."  Id.

The warrant authorized searches for [m]ethamphetamine and paraphernalia," "[o]ther controlled substances," and "[a]ll types of firearms and weapons," among other items.  Id. at 8-10.  The warrant states that the officers are "commanded to search" the 49th Street residence, the Gale Avenue residence, and the "Person" of Quintero.  Id. at 8.  The warrant further states,

"Included at the above-described location(s) are any and all rooms, attics, cellars, lofts, storage areas, and other parts therein, as well as the surrounding grounds and any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

storage rooms or outbuildings or garages of any kind located thereon; any combination safes or locked boxes therein; Also, all vehicles registered to, used by, under the control of, or found at the listed location that are connected to any of the individuals involved in this criminal act or conspiracy." Id.

Later that day, LBPD officers waiting outside of the Gale Avenue residence, prior to executing the search warrant, saw Quintero get into an SUV with his daughter. Dkt. 1 at 7. LBPD officers followed and stopped the SUV within blocks of the Gale Avenue residence and handcuffed Quintero. Id. The parties disagree on what happened next. According to Quintero, when Quintero asked why he had been pulled over, the officers responded, "you know why," and did not provide a traffic violation as the basis for the stop. Quintero Decl. at ¶ 4-5. Quintero asserts that he was not read his Miranda rights and was not asked whether he wished to waive his rights. Id. at ¶ 6. According to the government, Detective Thue escorted Quintero to his police car, placed him in the backseat, and immediately read Quintero his Miranda rights and asked whether Quintero understood his rights, to which Quintero responded "yes." Thue Decl. at ¶ 11-12. The government asserts that at no point did Quintero invoke his right to remain silent. Id. at ¶ 12.

Detective Thue told Quintero that the officers had a search warrant for the Gale Avenue residence and asked Quintero if he lived there, to which Quintero responded yes. Dkt. 54-3 at 5. Detective Thue asked Quintero if he had any weapons inside of the vehicle, and Quintero stated that he had a gun located inside of the center console. Dkt. 1 at 7. When an officer searched the center console, he found a loaded semiautomatic handgun, Quintero's wallet, and Quintero's cell phone. Id. Detective Thue then asked Quintero if there were any guns or drugs at the Gale Avenue residence, and Quintero stated that there was an assault rifle in the bedroom closet. Dkt. 54-3 at 5.

Later that day, LBPD officers searched the Gale Avenue residence and found a Wylde AR15-style semiautomatic rifle with an attached high-capacity magazine located in the northeast bedroom closet, a Mark-90 Sportster 7.62 rifle located in the southeast bedroom closet, six 30-round high-capacity magazines located inside of a bag in the northeast bedroom, and three coolpad cellular telephones on the top of a dresser in the northeast bedroom. Dkt. 1 at 8. After the search of the Gale Avenue residence, Detective Thue asked Quintero about the rifle found in the southeast bedroom, and Quintero said that he bought the gun from a friend. Dkt. 54-3 at 6. Quintero additionally told the officers that the magazines and ammunition found at the Gale Avenue residence belonged to him. Id. According to Detective Thue, Quintero acted evasive when asked about the 49th Street residence. Id. The LBPD officers then brought Quintero to the 49th Street residence, where other officers were conducting a search. Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

When the LBPD officers searched the 49th Street residence, they found a bag under the bed in the master bedroom containing a Uzi-type automatic firearm, three loaded high-capacity magazines for the firearm, a digital scale, numerous sandwich bags, and a box of ammunition; an AR15-style rifle, a SKS-style rifle, and a Mak-90 assault-style rifle in the master bedroom's south closet; two AR15-style rifles with no serial numbers in a master bedroom closet; Quintero's U.S. passport and approximately $60,870 in cash in a master bedroom closet; a Daewoo 9 millimeter semiautomatic handgun with a loaded magazine, an AK47-style automatic rifle, an AR15-style rifle with no serial number, a ballistic vest, and a digital scale in the master bedroom's north closet; four containers of MSN animal products commonly used as a narcotics "cutting" agent; items commonly used to package narcotics, including a pill press, a vacuum sealer, and shrink wrap; eight cell phones; high-capacity magazines and ammunition; and drugs, including approximately 1.132 grams of heroin, approximately 1.790 grams of methamphetamine; approximately 88 grams of marijuana; and approximately 445.1 grams of a substance later determined to be caffeine. Dkt. 1 at 8-10.

At the 49th Street residence, Detective Thue questioned Quintero while the other officers conducted the search. Dkt. 54-3 at 8. According to the police report, as items of evidence were located, Detective Thue brought the items to Quintero's attention, and Quintero told Detective Thue that all of the items found at the Gale Avenue residence and the 49th Street residence belonged to him. Id. Quintero told Detective Thue that he purchased the guns from friends on the street and further stated that he was not sure whether the narcotics found at the 49th Street residence were cocaine or fentanyl, but they could be either. Id. When asked about the cash found in the closet, Quintero stated that he thought that he had over $15,000 in cash hidden there. Id. According to Detective Thue, Quintero told him that he "screwed up and want[ed] to talk with [Detective Thue]" but was scared for his family. Id. Quintero additionally stated that he works in the emergency room at Long Beach Memorial Hospital and stays at both the Gale Avenue residence and the 49th Street residence. Id. When asked about S.F.'s overdose, Quintero stated that he knew B.M. and S.F. but had not spoken to them in a while. Id. Quintero said that he knew about the overdose death but refused to answer any further questions about it. Id.

On December 2, 2019, an examination of the firearms seized from the Gale Avenue residence and the 49th Street residence determined that the firearms included two machineguns, as defined in 26 U.S.C. § 5845(b), and three assault-style rifles with barrels less than 16 inches in length. Dkt. 1 at 11. On December 3, 2019, the Bureau of Alcohol, Tobacco, Firearms and Explosives conducted a records check of Quintero in the National Firearms Registration Transfer Record database and the ATF Federal Licensing System, which indicated that Quintero was not listed in either database. Id. at 12.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    '**O**'

## III.    DISCUSSION

### A.    Defendant's Motion to Suppress Statements and Evidence

Defendant moves the Court to suppress physical evidence and statements collected by LBPD officers on May 17, 2019, on three grounds.  First, defendant asserts that the search warrant was overbroad and lacked probable cause to seize firearms.  Dkt. 54 at 4.  Second, defendant asserts that the LBPD officers conducted an unlawful stop of the SUV that defendant was driving on May 17, 2019.  Id. at 6.  Third, defendant asserts that the LBPD officers did not advise defendant of his Miranda rights.  Id. at 9.  According to defendant, the firearms, statements, and Galaxy Note 8 seized on May 17, 2019, were obtained as a result of these violations of defendant's constitutional rights and therefore must be suppressed under the exclusionary rule.  Id. at 11.  The Court addresses each of defendant's arguments in turn.

1.    Defendant's Challenge of the Search Warrant

a. *Probable Cause to Search for Firearms*

Defendant argues that the search warrant executed by the LBPD officers on May 17, 2019, was overly broad and lacked probable cause to seize firearms.  Id. at 4.

i.    Legal Standard

"A search warrant is supported by probable cause if the issuing judge finds that, 'given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Underwood, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question.'"  United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (quoting United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)).  "Neither certainty nor a preponderance of the evidence is required."  Id.  "The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized."  United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986).  In determining whether a warrant is sufficiently specific, the Ninth Circuit considers "(1) whether probable cause exists to seize all items of a particular type described in the warrant, (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued."  Id. (internal citations omitted).  "A magistrate judge's finding of probable cause is entitled to great deference."  United States v. Clark, 31 F.3d 831, 834 (9th Cir. 1994).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

ii.   <u>Analysis</u>

The search warrant at issue authorized law enforcement to search the residences for "[a]ll types of firearms and weapons," among other items, including controlled substances.  Dkt. 54 at 5.  Defendant contends that "[n]owhere in the warrant affidavit did Detective Thue state a belief, or a factual basis for a belief, that firearms would be found at either of the locations.  Nor did the affidavit establish probable cause that any firearms that *might* be found would be evidence of a crime."  <u>Id.</u> at 6.  Rather, the information set forth in the affidavit pertained to B.M.'s purchase of drugs from defendant and the detective's knowledge that defendant worked in an emergency room where he may have access to fentanyl.  <u>Id.</u>  According to defendant, the "all types of firearms and weapons" provision in the search warrant was thus not based on information sufficient to establish probable cause that firearms constituting evidence of a crime would be found at the locations.  <u>Id.</u>  Therefore, defendant contends, the firearms seized at the residences must be suppressed because they were obtained in violation of the Fourth Amendment.  <u>Id.</u>

In its opposition, the government argues that the warrant provision authorizing the search for firearms was supported by probable cause because the affidavit established that defendant was a drug trafficker, and the issuing judge properly made a "commonsense determination[] . . . that drug-traffickers commonly carry firearms."  Dkt. 65 at 15-16.  Specifically, the affidavit indicated that defendant was a narcotics dealer who provided the fentanyl that resulted in S.F.'s death and described "DEA intel that defendant was 'being indicted for shipping cocaine and possibly heroin to Minnesota.'"  <u>Id.</u> at 16 (quoting Thue Decl. at 14).  The affidavit also included the "experience-based opinions" of Detective Thue, including his view that "'narcotics and other items related to narcotics sales' may be at the premises and that the 'occupants may . . . arm themselves.'"  <u>Id.</u> (quoting Thue Decl. at 14).  The government contends that the issuing judge permissibly made "reasonable inferences" from these pieces of information to find a "fair probability" that firearms would be at the residence.  <u>Id.</u> at 16 (quoting <u>Gates</u>, 462 U.S. at 238).

In his reply, defendant warns that the government's position "essentially asks the Court for a blanket rule permitting law enforcement to seize firearms wherever drug crimes are alleged."  Dkt. 66 at 3.  Defendant further argues that Ninth Circuit case law does not permit broad searches for any and all firearms without specific facts indicating the presence of such firearms.  <u>Id.</u>  <u>See</u> <u>Millender v. Cnty. of Los Angeles</u>, 620 F.3d 1016, 1025 (9th Cir. 2010), <u>rev'd sub nom. Messerschmidt v. Millender</u>, 565 U.S. 535 (2012) (invalidating warrant authorizing a search for firearms where the affidavit only referenced a specific sawed off shotgun and failed to "set forth any evidence [that the suspect] owned or used other firearms, that such firearms were contraband or evidence of a crime, or that such firearms were likely to be present.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

The government sets forth several alternative justifications for the seizure of the firearms that, it argues, render suppression inappropriate even if the warrant was improper as to firearms. First, the government argues that the LBPD officers properly seized the firearms under the plain view doctrine. Dkt. 65 at 18. According to the government, the LBPD officers found the firearms at the Gale Avenue residence and the 49th Street residence while executing a valid search for narcotics evidence in places where they could reasonably find such evidence. Id. at 19. Indeed, the government points out, many of the firearms were found in the places where officers also found narcotics evidence, such as in a bedroom closet and in a bag under a bed. Id. The government further argues that the incriminating nature of the firearms was immediately apparent because "the guns were obvious evidence of defendant's drug dealing activities given that they were stashed and stuffed alongside drug-trafficking paraphernalia, that many of them were loaded, and that many of them were illegal firearms (e.g., machineguns and short-barreled rifles)." Id. at 20.

Defendant argues that the plain view exception cannot justify seizure of the firearms because he claims that the incriminating nature of the firearms was not immediately apparent. Dkt. 66 at 7. Because it is not illegal to possess firearms, including loaded firearms, there was no indication that the firearms were *per se* illegal. Id. And, defendant contends, the fact that the firearms were located close to items appearing to be evidence of drug crimes does not render them obviously incriminating. Id. Rather, the incriminating nature of the firearms was only apparent after they had been seized, measured, and inspected. Id.

"The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." Illinois v. Andreas, 463 U.S. 765, 771 (1983) (citation omitted). To rely on the plain view exception, the government must demonstrate that (1) the officers are "lawfully searching the area where the evidence is found" and (2) "the incriminating nature of the evidence [is] immediately apparent." Roe v. Sherry, 91 F.3d 1270, 1272 (9th Cir. 1996) (citing Horton v. California, 496 U.S. 128, 135-36 (1990)). In requiring that the incriminating nature be immediately apparent, the standard requires only that the officer had "'probable cause to associate the property with criminal activity.'" Texas v. Brown, 460 U.S. 730, 741–42, (1983) (plurality) (quoting Payton v. New York, 445 U.S. 573, 587 (1980)). The officer need not "be possessed of near certainty as to the seizable nature of the items." Brown, 460 U.S. at 741.

Having carefully reviewed the parties' arguments and the information in the record, the Court finds that, at the present time, there is not enough information in the record to determine whether the provision in the warrant authorizing the search for "all types of firearms and weapons" was supported by probable cause. However, the Court concludes that the firearms

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                         **'O'**

were lawfully seized under the plain view exception.  The validity of the warrant as to controlled substances and drug paraphernalia is not contested, and the LBPD officers found the firearms in places where they could reasonably expect to, and, indeed, did, find controlled substances and drug paraphernalia, such as in bedroom closets and under the bed.

Further, "the incriminating nature of the [firearms was] immediately apparent," Roe, 91 F.3d at 1272, because, under the circumstances, it was reasonable to assume that the firearms were evidence of a narcotics offense.  The Ninth Circuit has upheld the plain view seizure of firearms as evidence of narcotics activity where the officer was conducting a lawful search for narcotics.  See United States v. Vaughn, No. 91-50657, 1992 WL 224228 (9th Cir., Sept. 14, 1992), at *4 (finding plain view seizure of firearms proper where officers had probable cause to believe cocaine was being sold from suspect's apartment because "[i]t was eminently reasonable for the officers to infer that the firearms were incriminating evidence of a narcotics offense.").  In doing so, it has recognized "the close relationship between drugs and firearms" reflected in related Ninth Circuit case law "approving lower court decisions allowing the admission of guns and firearms as evidence of involvement in the narcotics trade."  See id.; see also United States v. Savinovich, 845 F.2d 834, 837 (9th Cir. 1988), cert. denied, 488 U.S. 943 (1988) (concluding that guns seized from suspect's residence were admissible at trial for possession of a controlled substance with intent to distribute because it was reasonable to infer armed possessor of drugs intended more than personal use).[1]

---

[1] In his reply, defendant points out that a case cited by the government, United States v. Simpson, 10 F.3d 645, 647 (9th Cir. 1993), for the proposition that the plain view seizure of firearms as evidence of narcotics offenses is proper due to the close relationship between drugs and firearms in the narcotics trade, was vacated by the Supreme Court and therefore lacks precedential authority.  Dkt. 66 at 7.  While the Ninth Circuit's decision in Simpson, 10 F.3d 645, may lack precedential authority, it was vacated for the purpose of reconsideration in light of United States v. Shabani, 513 U.S. 10, 17 (1994), which held that proof of an overt act is not required to establish violation of a drug conspiracy statute.  See United States v. Simpson, 513 U.S. 983 (1994).  The Court does not interpret the vacatur as a rejection of the reasoning in Simpson relevant to this case.  Moreover, courts in this circuit have continued to follow the reasoning of Simpson to find that the plain view seizure of firearms was proper during a lawful search for narcotics evidence.  See, e.g., United States v. Brown, 551 F. Supp. 2d 947, 950 (D. Ariz. 2008) (concluding that officers investigating a suspect "for running an illegal drug operation" with "specific information that [the suspect] had sold [drugs] to others" reasonably assumed weapons found in the suspect's house during execution of search warrant were incriminating evidence of a narcotics offense); United States v. Cruz-Mejia, No. CR-11-350-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

Here, the officers had numerous pieces of information to support an inference that the firearms constituted evidence of drug trafficking, including B.M.'s statements that Quintero had sold her fentanyl purported to be cocaine; the information from the DEA that Quintero was being indicted for shipping cocaine and possibly heroin to Minnesota; and the presence of the drugs and other contraband associated with drug trafficking in the residences, much of which was located in close proximity to the firearms. Firearms, under these circumstances, are reasonably considered "incriminating evidence of a narcotics offense," Vaughn, 1992 WL 224228, at *4, and thus were properly seized under the plain view exception.

The government additionally argues that the firearms should be admitted, regardless of the warrant's validity as to firearms, under the inevitable discovery doctrine and under the good faith exception. With respect to the inevitable discovery doctrine, the government argues that the firearms should not be suppressed because the LBPD detectives would have inevitably discovered them. Dkt. 65 at 21. In following routine procedures for the search of narcotics evidence, the officers would have searched under the bed, in the closets, and in the bathroom, and thus would have found the firearms in those locations. Id.

Defendant counters with the same argument that he makes with respect to the plain view exception, specifically, that the inevitable discovery exception does not justify seizure of the firearms because the illegal nature of the firearms was not immediately apparent, dkt. 66 at 8, and the exception only applies "when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself," United States v. Reilly, 224 F.3d 986, 995 (9th Cir. 2000). Because the incriminating nature of the firearms was not apparent until after the seizure, defendant argues, the officers would not have obtained the firearms independently of the alleged Fourth Amendment violation. Dkt. 66 at 8.

"The inevitable discovery exception to the exclusionary rule is available when the government demonstrates, by a preponderance of the evidence, that it would inevitably have discovered the incriminating evidence through lawful means." United States v. Lopez–Soto, 205 F.3d 1101, 1106 (9th Cir. 2000). "[I]f 'by following routine procedures, the police would inevitably have uncovered the evidence,' then the evidence will not be suppressed despite a constitutional violation." United States v. Ankeny, 502 F.3d 829, 834-35 n.2 (9th Cir. 2007) (quoting United States v. Ramirez-Sandoval, 872 F.2d 1392, 1399 (9th Cir. 1989)).

As noted above, the officers in this case found the firearms in places where they would routinely search for controlled substances and drug paraphernalia, such as bedroom closets and

---

TUC-CKJ, 2011 WL 3924941, at *2 (D. Ariz. Sept. 7, 2011) (finding that officers conducting a search for drugs had probable cause to believe firearm was tied to a criminal purpose).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

under the bed.  And, as concluded with respect to the plain view exception, the incriminating nature of the firearms was immediately apparent because, under the circumstances, it was reasonable to assume that the firearms were evidence of a narcotics offense.  Thus, regardless of the warrant's validity to firearms, the government "would inevitably have discovered the incriminating evidence," Lopez–Soto, 205 F.3d at 1106, while lawfully searching for drugs and drug paraphernalia, and therefore the inevitable discovery exception is also applicable here.

The government further justifies the seizure of the firearms on the ground that the seizure was valid even if the warrant was insufficient because the LBPD officers "acting with objective good faith . . . obtained a search warrant from a judge or magistrate and acted within its scope." Dkt. 65 at 18 n.3 (quoting United States v. Leon, 468 U.S. 897, 920 (1984)).  Defendant responds that the government has not met its burden of "proving that officers relied on the search warrant "in an objectively reasonably manner,'" dkt. 66 at 4 (quoting United States v. SDI Future Health, Inc., 568 F.3d 706 (9th Cir. 2009)), because it has not offered evidence regarding "how many officers were involved in the search, what instructions were given, and how the searches were executed," id.

Evidence obtained pursuant to a facially valid search warrant, later found to be invalid, is admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant.  Leon, 468 U.S. at 922.  The "good faith test is an objective one," through which a court "ask[s] not what the executing officer believed, or could have believed, but 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'"  United States v. Luong, 470 F.3d 898, 902 (9th Cir. 2006) (quoting Leon, 468 U.S. at 922).

The Court need not reach this question in light of the applicability of the plain view and inevitable discovery exceptions.

Accordingly, the Court **DENIES** defendant's motion to suppress the firearms found in the Gale Avenue residence and the 49th Street residence.

### b.  Defendant's Request for a Hearing Pursuant to Franks v. Delaware

In his reply, defendant requests an evidentiary hearing on the validity of the affidavit. Dkt. 66 at 5.  The government's opposition attached an unredacted version of Detective Thue's warrant affidavit, which included a paragraph indicating that the DEA had informed Detective Thue that defendant was being indicted on drug offenses in Minnesota and that defendant utilized two addresses.  Id.  Defendant contends that the DEA's information was "stale" because the DEA's suspicions were based on surveillance from over a year before May 2019.  Id. According to defendant, a hearing on the validity of the affidavit is warranted because it is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**             **'O'**

unclear whether the DEA informed Detective Thue of this timeline and whether any other pertinent information was omitted from the affidavit.  Id. at 6.  And, according to defendant, there is "no information in the affidavit that Detective Thue took steps to find out whether Mr. Quintero still utilized either of [the two] addresses, which would be relevant to finding probable cause to search the two locations listed in the warrant."  Id. at 6.  Defendant claims that this omission misled the issuing judge and was made "at least recklessly."  Id.

i.   Legal Standard

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that defendants may attack the veracity of statements made in an affidavit that purportedly establishes probable cause for a search warrant.  Id. at 171.  An affidavit is presumed to be valid and to be granted a Franks hearing,

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; (5) the challenged statements must be necessary to find probable cause.

United States v. Perdomo, 800 F.2d 916, 920 (9th Cir.1986).  If a defendant can show that the affiant deliberately or recklessly made false statements or omissions in the affidavit, then the false statements are excluded and the affidavit is re-examined.  Franks, 438 U.S. at 171–72.  If, upon such reexamination, the content of the affidavit does not support a finding of probable cause, the defendant is entitled to an evidentiary hearing.  Id.  However, if the affidavit, in light of material omissions and excluding false statements, would nonetheless support a finding of probable cause, no hearing is required.  Id.

ii.   Analysis

Here, defendant has failed to show that any omissions impacted the probable cause analysis.  Defendant contends that the information in the affidavit from the DEA investigation is "stale," but "[a] search warrant is not stale where there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." United States v. Bowman, 215 F.3d 951, 964 (9th Cir. 2000).  Courts in this circuit have noted that, when a police investigation concerns an ongoing criminal business, such as drug trafficking, lapses of time between the dates of activities described in the affidavit and the issuance of the warrant do not render the warrant stale, and this is "especially the case where older information is coupled with recently obtained information."  Williams v. Cnty. of Santa Barbara, 272 F. Supp. 2d 995, 1012 (C.D. Cal. 2003); see also United States v. Foster, 711 F.2d

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

871, 878 (9th Cir.1983) (evidence of drug transactions that occurred fifteen months before search warrant was not stale where evidence also linked defendant to drug sale that happened twelve months later).

In this case, the information from the DEA's investigation concerning defendant's drug trafficking activity was coupled with the recent statements from B.M. that defendant had sold her cocaine before and had sold her the fentanyl that resulted in S.F.'s death. The fact that the information from the DEA investigation was gathered over a year before the warrant was issued thus does not render the information stale. Furthermore, contrary to defendant's assertions, the affidavit states that "detectives from the Long Beach Police Department's Drug Investigation Section found that Quintero uses both address[es]." Thue Decl. at 14. Put otherwise, the affidavit contained other information supporting probable cause to believe that Quintero used both addresses. Because defendant has not shown that "the challenged statements [are] necessary to find probable cause," Perdomo, 800 F.2d at 920, a Franks hearing is not warranted.

>          2.     Defendant's Challenge of the Vehicle Stop

>                    a. Standing

Defendant argues that the LBPD officers' stop of the vehicle that defendant was driving on May 17, 2019, violated defendant's Fourth Amendment rights. As a preliminary matter, the government claims that defendant has not established standing because defendant's declaration does not set forth "any facts establishing a reasonable expectation of privacy in the SUV or in the premises searched." Dkt. 65 at 9. Defendant counters that he has standing to challenge the stop of the vehicle because "a traffic stop entails a seizure of the driver," Dkt. 66 at 8 (quoting Brendlin v. California, 551 U.S. 249, 255 (2007)), and to challenge the search of the vehicle, despite the fact that he was not its registered owner, because he had permission to use the vehicle, id. (citing United States v. Thomas, 447 F.3d 1191, 1199 (9th Cir. 2006)). Defendant's reply attaches a declaration from the vehicle's owner stating that he had her permission to use the vehicle. See Sauceda Decl.

"[T]o contest the legality of a search or seizure, the defendant must establish that he or she had a 'legitimate expectation of privacy' in the place searched or in the property seized." United States v. Kovac, 795 F.2d 1509, 1510 (9th Cir. 1986) (quoting Rakas v. Illinois, 439 U.S. 128, 143–44, 99 S.Ct. 421 (1978)). The expectation of privacy must be (1) subjectively genuine, and (2) "one that society is prepared to accept as reasonable and therefore, legitimate." Id. A person has such an expectation in a vehicle that he owns or otherwise exercises control over. Id. at 1510–11. Even when an individual is not an officially authorized user of the vehicle, they may have standing if they operate the vehicle with the authorized user's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

permission.  See Thomas, 447 F.3d at 1199 (explaining that driver of a rental car may have standing if he operates the rental car with the permission of the authorized renter).

When the officers stopped and searched the vehicle that defendant was driving, he was using the vehicle with the permission of its owner.  See Sauceda Decl.  Accordingly, he had a reasonable expectation of privacy in the vehicle, despite not being the vehicle's owner, and may contest the legality of the vehicle's search.

### b. The Stop and Search of the Vehicle

#### i.   Legal Standard

Generally, law enforcement officers may not conduct a search without a search warrant. Katz v. United States, 389 U.S. 347, 357 (1967).   "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  Riley v. California, 134 S. Ct. 2473, 2482 (2014).  "The government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement."  United States v. Cervantes, 703 F.3d 1135, 1141 (9th Cir. 2012).

#### ii.   Analysis

Defendant argues that the stop of the vehicle violated the Fourth Amendment because the search warrant did not authorize the arrest of defendant at a location outside of the search premises or the search of a vehicle not located at the Gale Avenue residence or the 49th Street residence, and the vehicle stop was not otherwise supported by reasonable suspicion or probable cause.  Dkt. 54 at 6-7.  Defendant characterizes the stop of the vehicle as a traffic stop "ruse" because no traffic violation occurred, and "at no point did Detective Thue or other officers provide a traffic violation as the basis for the stop."  Id. at 9.

Defendant analogizes to two cases to support the position that this stop violated defendant's Fourth Amendment rights.  First, defendant points to Bailey v. United States, 568 U.S. 186, 190 (2013), in which police obtained a warrant to search the residence of defendant Bailey for a handgun.  Prior to executing the search warrant, police officers surveilling Bailey's residence observed Bailey drive away in a vehicle, followed and pulled over the vehicle, and arrested Bailey.  Id. at 190-91.  The Supreme Court held that the officers violated Bailey's rights by arresting him away from the location identified in the search warrant.  Id. at 201. Second, defendant cites United States v. Ramirez, 976 F.3d 946, 950 (9th Cir. 2020), in which the FBI untruthfully told defendant Ramirez that a burglary had just occurred in his home where, unbeknownst to Ramirez, the FBI was executing a search warrant.  Once Ramirez arrived at his residence, the FBI searched and questioned him.  Id.  The Ninth Circuit Court of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**              **'O'**

Appeals held that this "ruse" violated the Fourth Amendment.  Id. at 955.  According to Quintero, Bailey and Ramirez compel suppression of the statements and items, (specifically, the handgun, Quintero's wallet and driver's license, and the Galaxy 8 Note), that were seized from the vehicle.  Dkt. 54 at 8-9.

The government counters that the search warrant authorized the search of defendant and the vehicle he was driving.  Dkt. 65 at 9.  According to the government, the plain terms of the warrant "explicitly authorized a search of defendant's person and vehicles 'under' his 'control.'"  Id. at 10.  Nothing in the warrant, the government contends, "require[ed] officers to search defendant or vehicles under his control at or near the 49th Street House or the Gale Avenue House."  Id. at 11.  Thus, in stopping and searching the vehicle driven by defendant, the officers were simply executing the warrant.  Id. at 10-11.

In response to the government's argument that the warrant, by its terms, authorized the stop and search of the vehicle, defendant argues that the warrant only authorized the search of vehicles and defendant's person "at the listed location[s]," meaning at the Gale Avenue residence and the 49th Street residence.  Id. (quoting dkt. 65-1 at 8).  Therefore, defendant contends, the warrant did not permit the search of defendant and the SUV once defendant had driven away from the Gale Avenue residence.  Id.

The Court concludes that the search of the vehicle was proper because it was authorized by the warrant's plain terms.  The warrant commanded officers to search two addresses, the Gale Avenue residence and the 49th Street residence, and listed "[a]dditional" "premises to be searched," which included "all vehicles registered, to, used by, under the control of, or found at the listed location that are connected to any of the individuals involved in this criminal act or conspiracy."  Thue Decl. at 8.  The natural reading of this provision is that the warrant authorized searches of all vehicles registered to individuals involved in the criminal act, all vehicles used by such individuals, all vehicles under the control of such individuals, and all vehicles found at the listed location that are connected to such individuals.  The Court does not interpret "at the listed location" to modify every clause.  In this case, the officers stopped and searched a vehicle used by and under the control of defendant, an individual involved in the alleged criminal act.  Accordingly, the warrant authorized the search of defendant's vehicle.

The cases that defendant cites are therefore inapposite.  In Bailey, the Supreme Court held that officers executing a search warrant may only detain a suspect in the immediate vicinity of the premises to be searched.  568 U.S. at 201.  The warrant in Bailey authorized a search of Bailey's basement apartment, thus, the officers' stop of Bailey's car outside of the immediate vicinity of Bailey's apartment violated Bailey's Fourth Amendment rights.  Id. at 189.  The warrant in this case, by contrast, authorizes the search of a vehicle used by and under the control

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

of defendant; therefore, the detention of defendant next to the vehicle was within the "immediate vicinity of the premises to be searched." Id. at 201.

Ramirez is likewise inapposite because the warrant in that case authorized the search of the suspect's residence as well as "[v]ehicles located at or near the premises that fall under the dominion and control of [the suspect] or any other occupant of the premises." 976 F.3d at 949. The warrant "permitted the FBI to search or seize Ramirez's car *only* if it was located 'at or near the premises.'" Id. at 950. The officers' search and seizure of the suspect and his car were unconstitutional because "Ramirez and his car were at the residence, and consequently within the scope of the warrant and the Summers rule, only because of the unjustified ruse," id. at 959, that is, the officers' use of deception to draw the suspect to the residence. In this case, the LBPD officers were authorized to search the vehicle because the warrant explicitly authorized the search.[2]

Because the search of defendant's car was authorized by the warrant, the officers properly detained defendant within the immediate vicinity of the search premises when they handcuffed him and brought him to the back of the police car. See Bailey, 568 U.S. 201. The search of the vehicle led to the discovery of the loaded handgun in the center console, which provided a basis for arresting defendant because possessing a loaded firearm in a vehicle is a crime in California. See Thue Decl. at ¶ 13. Defendant does not appear to contest the validity of his arrest on this ground but rather focuses his challenge on the initial stop and search of the vehicle, which, he argues, was improper and therefore requires suppression of the evidence found in the vehicle. As the Court has concluded that the warrant authorized the search of the vehicle, the Court finds that the subsequent arrest was proper and that the items seized as a result of the search of the vehicle should not be suppressed.

The government additionally argues that the stop and search of the vehicle was justified regardless of the warrant's terms because the officers had reasonable suspicion to stop defendant and probable cause to search the vehicle. Dkt. 65 at 12. It contends that the officers had reasonable suspicion of drug trafficking because of B.M.'s statements, the DEA's investigation, and the information that defendant resided at both the 49th Street residence and

---

[2] The Court recognizes that there are inconsistencies with respect to whether the LBPD officers characterized the search of the vehicle as execution of the warrant. Compare Dkt. 1 at 7 ("LBPD officers conducted a traffic stop of Quintero's SUV") with Thue Decl. at ¶ 9 ("Because the warrant authorized law enforcement to search defendant's person and vehicles under his control, Detective Ur instructed unmarked units to stop the car when the opportunity presented itself."). But such inconsistencies, while they may be relevant for other purposes, do not alter the fact that the warrant authorized the search.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                '**O**'

the Gale Avenue residence, which, based on officer experience, aligned with activity of narcotics traffickers. Id. at 13. The government claims that the search of the SUV was then proper under the automobile exception to the warrant requirement because the officers had probable cause to believe the SUV contained evidence of a crime. Id. The officers had probable cause, the government argues, for the same reasons for which they had reasonable suspicion to stop the vehicle. Id. Defendant argues that this information is insufficient to establish reasonable suspicion or probable cause. Dkt. 66 at 11.

The Court need not decide whether the stop and search of the vehicle were independently justified based on reasonable suspicion and probable cause in this case given that the warrant authorized the search of the vehicle. Accordingly, the Court **DENIES** defendant's motion to the extent it seeks to suppress the items found in the vehicle.

       3.    Defendant's Miranda Challenge

Finally, defendant asserts that the LBPD officers failed to provide him with Miranda warnings prior to questioning him, in violation of his Fifth Amendment rights. Dkt. 54 at 9.

"Individuals possess the right to be informed, prior to custodial interrogation, 'that [they have] the right to the presence of an attorney, and that if [they] cannot afford an attorney one will be appointed for [them] prior to any questioning if [they] so desire . . . .'" United States v. San Juan-Cruz, 314 F.3d 384, 387 (9th Cir. 2002) (quoting Miranda v. Arizona, 384 U.S. 436, 479 (1966)). Statements elicited in violation of this right may not be introduced for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322 (1994). Generally, the obligation to give a Miranda warning applies only where an individual is both in custody and subject to interrogation. Miranda, 384 U.S. at 477-78; United States v. Patzer, 277 F.3d 1080, 1085 (9th Cir. 2002).

There is a factual dispute as to whether Detective Thue read defendant his Miranda rights. In his declaration, Quintero states that "[a]t no point was I read my Miranda rights. At no point was I asked if I wished to waive my rights." Quintero Decl. at ¶ 6. The government asserts that "Detective Thue immediately read defendant his Miranda rights as soon as he placed him in the backseat of the . . . police car and before questioning occurred." Dkt. 65 at 22. The government points out that Detective Thue was "well aware of his Miranda obligations," given his twenty-six years of experience as a police officer, and carried with him a Miranda advisal card. Id. Additionally, another LBPD detective involved in the stop corroborated Detective Thue's account, stating that "Detective Thue immediately read [defendant] his Miranda rights . . . to which he responded, 'yes' to the waiver question." Id. at 23.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

The Court held an evidentiary hearing pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) on the question of whether defendant was Mirandized when he was taken into custody.  Detective Thue testified for the government, stating that he had read <u>Miranda</u> warnings for defendant once defendant was stopped, taken into custody, and placed in the police car in the rear seat.  Defendant denied that he was Mirandized and noted that he had been placed in the front passenger seat of the police car.  There was no recording or video made in connection with the stop of defendant's vehicle.  Counsel for defendant argued that because the officers had used recording devices to document other aspects of their search on May 17, 2019, the Court should infer that the reason there was no record of defendant being Mirandized was that no <u>Miranda</u> warning was given.  In response, the government countered that the LBPD did not have a policy requiring officers to wear body cameras or otherwise record such searches at that time.  The government further noted that the LBPD did not issue recording devices to officers in Thue's unit at that time.  Defendant argued that the <u>Miranda</u> advisal from which Thue allegedly read the warning was itself deficient.[3]

The Court finds Thue's testimony to be more credible.  First, because Thue testified that he customarily Mirandizes defendants using the advisal card, there is no reason to think he did not do the same in this case.  No evidence was presented that Thue had failed to Mirandize other defendants.  On the other hand, defendant is self-interested, and the fact that he testified that he was placed in the front seat of the police car, (which would be contrary to all policy), suggests that he may not have a clear memory of what happened when he was stopped.  Because the government bears the burden of proving that defendant was Mirandized by a preponderance of evidence, in this case, the Court finds that the government's testimony is more credible.

Accordingly, the Court **DENIES** defendant's motion to suppress the statements made to the LBPD officers on May 17, 2019.

---

[3] At oral argument, the government submitted into evidence a copy of a <u>Miranda</u> advisal card that included the <u>Miranda</u> warning that Detective Thue claims he read to defendant. Defendant argued that the text on the card constitutes an inadequate <u>Miranda</u> warning because it does not state that the suspect has the right to stop speaking with law enforcement at any time. The law does not require a "'precise formulation of the warnings given' to a suspect" and "a 'talismanic incantation' is not necessary to satisfy <u>Miranda</u>'s 'strictures.'"  <u>United States v. Loucious</u>, 847 F.3d 1146, 1149 (9th Cir. 2017) (quoting <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981)).  Rather, "[t]he inquiry is whether the warnings reasonably convey to a suspect his rights as required by <u>Miranda</u>."  <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989).  The warning on the <u>Miranda</u> advisal card, which is routinely used by law enforcement, meets this standard because defendant's right to stop speaking can be reasonably inferred from his right to silence.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                         **'O'**

**B.      Defendant's Motion to Permit Limited Attorney-Conducted _Voir Dire_**

        1.      <u>Legal Standard</u>

        Rule 24(a) of the Federal Rules of Criminal Procedure governs the _voir dire_ process, and provides:

        The court may examine prospective jurors or may permit the attorneys for the parties to do so. If the court examines the jurors, it must permit the attorneys for the parties to ask further questions that the court considers proper or submit further questions that the court may ask if it considers them proper.

Fed. R. Crim. P. 24(a).  The Court has in its "sound discretion" the authority to exclusively conduct _voir dire_. <u>See U.S. v. Baldwin</u>, 607 F.2d 1295, 1297 (9th Cir.1979); <u>see also U.S. v. Jones</u>, 722 F.2d 528, 529 (9th Cir.1983) ("The trial court is given wide latitude to determine how best to conduct the _voir dire_.")

        2.      <u>Analysis</u>

        Defendant moves the Court to permit supplemental attorney _voir dire_ of one hour per side. Defendant argues that (1) attorney-conducted _voir dire_ promotes selection of an impartial jury; (2) attorney knowledge in the case enhances the probative effect of questioning, and (3) attorney-conducted _voir dir_e will limit error on appeal.  Dkt. 54 at 4–7.  Finally, defendant argues that because fentanyl-related deaths are now a source of significant public concern in Southern California, it is important to assess any bias when questioning prospective jurors.  <u>Id.</u> at 7.

        The government opposes defendant's suggested attorney-conducted _voir dire_ of one hour per side, arguing that defendant has "failed to present a sufficiently compelling reason" to do so. Dkt. 62 at 3 (citing <u>U.S. v. Gomez</u>, 772 F. Supp. 2d 1185, 1194 (C.D. Cal. 2011)).

        Defendant's request ignores that the Court will solicit _voir dire_ questions from the government and defendant in advance of the trial.  Those questions will be asked of all prospective jurors in the course of jury selection.  After those questions are answered, the Court will permit each side approximately twenty minutes to follow up on any answers the jurors have provided. In the Court's view, the Court's procedure fully accommodates defendant's concerns.

        Accordingly, the Court **DENIES** defendant's request.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

**C.    Defendant's Motion to Sever Counts**

      1.    <u>Legal Standard</u>

An indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).

"'[B]ecause Rule 8 is concerned with the propriety of joining offenses in the indictment, the validity of the joinder is determined solely by the allegations in the indictment.'" <u>United States v. Jawara</u>, 474 F.3d 565, 573 (9th Cir. 2006) (quoting <u>United States v. Terry</u>, 911 F.2d 272, 276 (9th Cir. 1990)). "Rule 8 has been 'broadly construed in favor of initial joinder.'" <u>Id.</u> at 573 (quoting <u>United States v. Friedman</u>, 445 F.2d 1076, 1082 (9th Cir. 1971)); <u>United States v. Armstrong</u>, 621 F.2d 951, 954 (9th Cir. 1980) ("[J]oinder is the rule rather than the exception.").

Even where initial joinder is proper, "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The decision whether to sever properly joined defendants under Rule 14 is "committed to the sound discretion of the trial court." <u>United States v. Adams</u>, 581 F.2d 193, 197 (9th Cir. 1978).

      2.    <u>Counts in the Second Superseding Indictment</u>

Defendant is charged with one count of fentanyl distribution in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), one count of using and maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1), one count of knowingly possessing firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), two counts of unregistered firearm possession in violation of 26 U.S.C. § 5861(d), and one count of machinegun possession in violation of 18 U.S.C. § 922(o)(1).

The fentanyl distribution count requires the government to prove (1) "defendant knowingly distributed [fentanyl];" and (2) that "defendant knew that it was [fentanyl] or some other federally controlled substance." Model Crim. Jury Instr. 9th Cir. 12.4 (2022).

The drug-involved premises count requires the government to prove that the defendant "knowingly maintained a place for the purpose of distributing . . . or using a controlled substance." Model Crim. Jury Instr. 9th Cir. 12.18 (2022).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

The count for firearm possession in furtherance of a drug trafficking crime requires the government to prove that the defendant (1) "committed the crime of [using or maintaining a drug-involved premises] as charged in [count five] of the indictment" and (2) "possessed the firearm in furtherance of the crime." Model Crim. Jury Instr. 9th Cir. 14.23 (2022). A person "possesses" a firearm if the person "knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it." Id.

The unregistered firearm possession counts require the government to prove that (1) defendant "knowingly possessed" the specific firearm, (2) defendant "was aware that the [specific firearm] was [a firearm and a short-barreled rifle, as defined in Title 26 of the United States Code]," and (3) defendant "had not registered [the specific firearm] with the National Firearms Registration and Transfer Record." Model Crim. Jury Instr. 9th Cir. 14.25 (2022).

Finally, 18 U.S.C. § 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun."

      3.   <u>Analysis</u>

Defendant moves the Court to sever counts on two grounds. He first argues that the counts are impermissibly joined pursuant to Federal Rules of Criminal Procedure, Rule 8, and that even if they are properly joined, they should be severed pursuant to Rule 14. At oral argument, defendant explained that he moves to sever the fentanyl-distribution count from all other counts in the second superseding indictment. The Court addresses each of defendant's arguments in turn.

As to Rule 8, defendant argues that none of these three preconditions for joinder—"same or similar character," "based on the same act or transaction," or "common scheme or plan"—are satisfied in this case. Dkt. 63 at 3. Defendant argues that the counts are not part of the "same act or transaction" because "B.M. reported that she had obtained a drug from Mr. Quintero that resulted in the death of another. At no time did B.M. assert that Mr. Quintero used, possessed, or referenced any firearm during what she perceived to be a routine drug transaction." Id. at 4.

Defendant further contends that the counts are not part of a "common scheme or plan," and that the "only tie between them" is defendant's "alleged culpability" as the indictment "does not suggest that '[c]omission of one of the offenses depended upon or necessarily led to the commission of the other; proof of the one act constituted or depended upon proof of the other.' " Id. (quoting United States v. Halper, 590 F.2d 422, 429 (2d Cir. 1978)).

Finally, defendant argues that the counts are not "of the same or similar character," citing the Ninth Circuit's six factors in United States v. Jawara: (1) the elements, (2) the temporal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

proximity of the acts, (3) the likelihood and extent of evidentiary overlap, (4) the physical location of the acts, (5) the modus operandi, and (6) the identity of the victims. 474 F.3d 565, 578 (9th Cir. 2007). Here, defendant argues that there is no elemental or temporal overlap between the counts Id. at 4–5. Defendant additionally contends that there is minimal evidentiary overlap between the counts. Id. at 5. Defendant also contends that the acts underlying the separate counts do not share the same physical location, because while "the location of the drug transaction is alleged to have been an In-N-Out burger restaurant[, . . . t]here is no indication that B.M. was ever present at any residence maintained by Mr. Quintero." Id. Finally, defendant asserts that the counts do not share a common modus operandi, nor do the counts have a common alleged victim. Id.

In opposition, the government argues that because the fentanyl-distribution count and the four firearms counts are connected to the drug-involved premises count, all counts are properly joined with each other in this case. Specifically, the government contends that that the drug-involved premises counts alleges that defendant maintained or used the 49th Street House to manufacture and distribute drugs, while "the firearms found at 49th Street House furthered that distribution business, and were found at the same time and in the same location." Dkt 68. At 15–16. Similarly, the government describes how defendant's "fatal drug deal with B.M. is just one example of defendant's distribution, which occurred within twenty-four hours of officers seizing defendant's drug-trafficking paraphernalia and within the time period that defendant maintained or used the 49th Street House. Id. at 16.

Having considered the parties' arguments, as well as the underlying elements of the counts in the second superseding indictment, the Court concludes that joinder of all counts is proper under Rule 8. As set forth above, the fentanyl-distribution and drug-involved premises counts respectively require the government prove defendant knowingly distributed fentanyl and knowingly maintained a place for the purpose of distributing a controlled substance. Moreover, the unlawful firearm possession and firearm in furtherance of drug trafficking counts require the government to prove that defendant knowingly possessed firearms, including but not limited to the unregistered firearms and the machinegun, and possessed those same firearms in furtherance of the alleged drug-involved premises offense. Accordingly, these counts are part of the same "common scheme or plan" and are of a "same or similar character."

Even when charges are properly joined under Rule 8, Rule 14 permits severance of counts if joinder would unfairly prejudice a party. Here, defendant cites to Ninth Circuit cases outlining the potential prejudicial impacts of joined charges for a single defendant. For instance, "the jury may cumulate the evidence of the various crimes charged and find guilt when, considered separately, it would not so find." Dkt. 63 at 6 (quoting U.S. v. Johnson, 820 F.2d 1065, 1070 (9th Cir. 1987)). Specifically, defendant argues that "[i]nstructing the jury to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

consider the evidence as to each count separately is of questionable efficacy under the circumstances here." Id.

In opposition, the government contends that defendant has failed to show that "joinder [is] so manifestly prejudicial that it outweigh[s] the dominant concern with judicial economy. Dkt. 68 at 16 (quoting U.S. v. Whitworth, 856 F.2d 1268, 1277 (9th Cir. 1988)). The government asserts that defendant "generic claim[s]" that a joint trial may cause the jury to view him with a "latent feeling of hostility," infer that he has a "criminal disposition," or fail to adequately "compartmentalize the evidence" are "plainly insufficient to meet defendant's burden under Rule 14). Id. (citing dkt. 63 at 4–5). Additionally, the government contends that the overlapping nature of the counts would require duplicative presentation of evidence in the event the counts were severed. See id. at 18 ("Where 'evidence of one of the crimes would be admissible in a separate trial for the other crime,' either as part of the same narrative of events or for a permissible purpose under Federal Rule of Evidence 404(b), the prejudice arising from trying the crimes together is minimal.") (quoting U.S. v. Begun, 446 F.2d 32, 33 (9th Cir. 1971)). Finally, the government argues that any risk of undue prejudice can be addressed by providing limiting instructions during trial and prior to jury deliberations. Id.

There is a presumption against severance unless joinder would result in unfair prejudice. See U.S. v. Armstrong, 621 F.2d 951, 954 (9th Cir. 1980) (explaining that "[j]oinder is the rule rather than the exception"). Here, the defendant has failed to make any such showing. Moreover, as the government argues, even if the counts were severed, the government would still be entitled to produce the evidence of firearms for the drug counts and the evidence of the drugs for the firearms counts. Accordingly, it appears that severance would result in duplicative trials without materially preventing unfair prejudice. To the extent there is any risk of prejudice, that prejudice can be addressed through appropriate limiting instructions. See U.S. v. Rodriguez-Landa, No. 13-CR-00484-CAS, 2019 WL 653853, at *7 (C.D. Cal. Feb. 13, 2019) ("Courts regularly hold that prejudice from a refusal 'to sever counts can be cured by proper jury instructions, and juries are generally presumed to follow their instructions.' ") (quoting U.S. v. Hickerson, 489 F.3d 742, 746 (5th Cir. 2007)).

Accordingly, the Court **DENIES** defendant's motion to sever counts.

## D.    **Defendant's Motion to Exclude Evidence From a DEA Investigation**

### 1.    Legal Standard

A motion *in limine* is "a procedural device to obtain an early and preliminary ruling on the admissibility of evidence." Goodman v. Las Vegas Metro. Police Dep't, 963 F. Supp. 2d 1036, 1046 (D. Nev. 2013). Trial courts have broad discretion when ruling on such motions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

See Jenkins v. Chrysler Motor Corp., 316 F.3d 664, 664 (7th Cir. 2002).  Moreover, such rulings are provisional and "not binding on the trial judge" on the court.  Ohler v. United States, 529 U.S. 753, 758 n.3 (2000).  "Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded."  Ind. Ins. Co. v. Gen. Elec. Co., 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).

            2.    Analysis

The basis for this motion *in limine* arises from evidence gathered during a Minnesota-based DEA investigation conducted in 2018, in which law enforcement officials conducting a wiretap for suspects involved in a drug-trafficking conspiracy intercepted communications between defendant and a co-conspirator named Gonzalez. Dkt. 70 at 2–6. The communications between defendant and Gonzalez allegedly discuss drug trades involving defendant's 49th Street House.  Id.  The government proffers its intended introduction of evidence at trial as follows:

> The government intends to call DEA Special Agent Connie Gerten, the primary case agent who investigated defendant for distributing drugs to Gonzalez and who overheard defendant's recorded conversations and reviewed his text messages discussing that distribution. Through Agent Gerten, the government will seek to move in at least two text message chains and two short audio calls between defendant and Gonzalez.  Agent Gerten will also likely describe her efforts to locate defendant, including how Agent Gerten received pings placing defendant at the 49th Street House when he was heard over the wiretaps.

> The government also anticipates calling LBPD Detective David Urbina to testify about his surveillance at the 49th Street House in April 2018, which occurred before the April 19, 2018 call between defendant and Gonzalez. That testimony will include his observations of defendant coming and going from the house, identification of defendant, and identification of a truck with Minnesota plates parked in front of the house that was registered to a co-conspirator.

Id. at 8–9.  At oral argument, the government confirmed that it intends to introduce excerpts of audio recordings and text message exchanges intercepted from a duly authorized wire interception, alongside the testimony of an appropriate translator, Detective David Urbina who surveilled defendant's house during the wiretap, and a cooperating witness in the Minnesota drug conspiracy investigation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

In his motion *in limine*, defendant seeks to exclude this evidence on the basis that it is irrelevant to the current case, is being introduced as inadmissible propensity evidence of "prior bad acts," and in any event has its probative value substantially outweighed by the danger of unfair prejudice and confusion of the issues.  Dkt. 61 at 6.

In opposition, the government argues that the evidence is relevant under Federal Rule of Evidence 401 as either "direct evidence" of, or being "inextricably intertwined" with, the drug-involved premises count.  Dkt. 70 at 10–12.  Alternatively, the government argues that the evidence is admissible under Rule 404(b) as prior bad acts to show defendant's "intent, knowledge, motive, opportunity, absence of mistake, or lack of accident" with respect to all of defendant's counts.  Id. at 12–13.  Finally, the government argues the evidence would not result in any unfair prejudice substantially outweighing its probative value.  Id. at 21.

The Court agrees with the government that the proffered evidence from the DEA investigation will be admissible at trial under one of the three grounds the government as identified—direct evidence, inextricably intertwined with the drug-involved premises count, or as Rule 404(b) evidence.  Furthermore, the Court does not find that the proffered evidence is unfairly prejudicial in this case.  Appropriate limiting instructions can prevent the use of this evidence for an improper purpose.

The Court **DENIES** defendant's motion *in limine* to exclude evidence of the DEA investigation.

### E.    Defendant's Motion to Exclude Agent Gertler's Expert Testimony

Defendant seeks to preclude the testimony of the government's expert witness, Agent Jason Gertler, who, according to the government, intends to testify on the following topics:

(1) common methods and practices of drug dealers in packaging, weighing, storing, and transporting their drugs; (2) items commonly used as drug paraphernalia; (3) the risks associated with drug trafficking and the security measures drug dealers often employ in order to protect their product and profit, including how drug traffickers keep firearms loaded and/or in close proximity to drug-trafficking paraphernalia and in accessible locations; (4) general structures and methods of cocaine, methamphetamine, and fentanyl distribution, including the rough market prices of cocaine in or around 2019 and cocaine and fentanyl in or around 2019, and the process of shipping cocaine and other drugs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**　　　　　**'O'**

across state lines; (5) the use of cash in drug sales; and (6) the use of coded language to refer to controlled substances to describe the type, amount, and quality of drugs.[4]

Bahadue Decl. Exh. B at 2. Defendant argues that Agent Gertler's testimony should be precluded pursuant to Federal Rule of Evidence 702, ("Rule 702"), and the Confrontation Clause of the United States Constitution. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

　　　1.　　Defendant's Argument Under Federal Rule of Evidence 702

First, defendant argues that Agent Gertler's testimony is inadmissible because it is not based on reliable principles or methodologies and therefore violates Rule 702. Dkt. 62 at 4.

　　　　*a. Legal Standard*

Rule 702 allows for expert testimony, subject to certain requirements and conditions:

　　　A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule 702 inquiry "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592–93 (1993). The district court must also "ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact . . . . Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact." United States v. Finley, 301 F.3d 1000, 1008 (9th Cir. 2002) (citing Daubert, 509 U.S. at 591–93). Daubert's "gatekeeping obligation" "applies not only to

---

　　　[4] According to defendant, the government originally informed the defense that Agent Gertler would provide testimony regarding the presence of a statue of "Santa Muerte" in defendant's residence and the statue's symbolism for individuals involved in drug activity. Dkt. 62 at 3. In its opposition, the government states that it will no longer be asking Agent Gertler to discuss the Santa Muerte statue and has notified the defense of this change in a supplemental disclosure. Dkt. 69 at 5 n.3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

testimony based on 'scientific' knowledge but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Company v. Carmichael, 526 U.S. 137, 141 (1999). "[I]n considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally." United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000).

In acting as the gatekeeper, the trial court has broad discretion in deciding whether to admit or exclude expert testimony. See e.g., General Elec. Co. Joiner, 522 U.S. 136, 142 (1997); United States v. Espinosa, 827 F.2d 604, 611 (9th Cir.1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous.").

  *b. Analysis*

Defendant asserts that Agent Gertler has general qualifications based on his experience as a DEA agent but "lacks a verifiable scientific methodology underpinning his expert opinion." Dkt. 62 at 5. Defendant further argues that, in the event the Court allows Agent Gertler to testify, the Court should conduct a Daubert hearing to ensure his opinions are based on reliable principles and methodology. Id. at 6. Without a Daubert hearing, defendant argues, the Court "cannot determine the bases for his opinions, how much hearsay testimony, if any, is a necessary predicate for his opinions, whether such hearsay is 'of a type reasonably relied upon by experts in the particular field,' or whether he applied sound principles to his analysis." Id. at 6-7 (quoting Fed. R. Evid. 703).

In its opposition, the government states that, while it notified the defense that Agent Gertler intended to testify and identified the topics his testimony would cover in June 2022, see Bahadue Decl. Exh. A at 5, it inadvertently did not send Agent Gertler's *curriculum vitae* to the defense prior to defendant's filing of the motion *in limine* to exclude the expert testimony, dkt. 69 at 5. Following defendant's filing of the motion *in limine*, the government sent the defense a supplemental disclosure regarding Agent Gertler's anticipated testimony, which identifies the following bases of his expert opinion:

  (i) his first-hand participation in many aspects of drug trafficking investigations, including conducting physical and electronic surveillance, executing search warrants, seizing drugs and drug-related assets, wiretaps, and making arrests; (ii) his participation as a case agent and an investigating agent in several drug trafficking investigations; (iii) his first-hand experience listening to wiretaps and reviewing transcripts and text messages of defendants, informants, confidential sources, and witnesses using coded language to describe the type, quantity, and quality of drugs and the distribution of drugs; (iv) his experience in debriefing numerous defendants, informants, confidential sources,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**               **'O'**

and witnesses who had personal knowledge and experience regarding drugs, drug
trafficking, and drug trafficking organizations; (v) receiving training and education in the
properties, use, and distribution of controlled substances from experienced law
enforcement officers with expertise in investigating drug trafficking; and (vi) working
with other law enforcement officers and agents with specialized knowledge of and
experience with investigating drugs, drug trafficking, and drug trafficking organizations.

Id. at 5-6.  The government's opposition attaches these supplemental disclosures.  See Bahadue
Decl. Exh. B.  The government additionally sent the defense an updated *curriculum vitae* for
Agent Gertler that includes a detailed summary of his training and law enforcement experience
over the past 25 years, which, the government asserts, also form the bases of his expertise.  Dkt.
69 at 6.

The government argues that it has provided defendant with sufficient information about
the sources of Agent Gertler's knowledge, in compliance with Federal Rule of Criminal
Procedure 16, ("Rule 16").  Id. at 7.  Additionally, the government asserts that it made its
disclosures sufficiently before trial that the timeline does not run afoul of Rule 16 or prejudice
defendant, despite the inadvertent delay.  Id. at 8.

With respect to Agent Gertler's qualifications under Rule 702, the government states that
the Ninth Circuit and this Court "routinely permit law enforcement officers to testify as experts
based on experience that has sufficient indicia of reliability," and asserts that there is no reason
why Agent Gertler should be treated differently.  Id. at 9.  See United States v. Freeman, 498
F.3d 893, 901 n.1 (9th Cir. 2007) (finding that officer with 11 years of law enforcement
experience who had participated in more than 100 narcotics investigations was qualified to offer
expert testimony); United States v. Norena, 908 F.2d 497, 501 (9th Cir. 1990) (upholding
admission of testimony from expert with four years of experience involving over 200 narcotics
arrests).  Agent Gertler, the government argues, has approximately 25 years of law enforcement
experience, has handled over 100 drug trafficking investigations, and has listened to hundreds
of wiretap calls, among other relevant experience.  Dkt. 69 at 11.  The government further
points out that Agent Gertler has provided expert testimony on similar topics in four prior cases
in this district.  Id. at 11-12.  See United States v. Jolly, No. 2:20-CR-00438-MCS (C.D. Cal.
Dec. 3, 2021), dkt. 111; United States v. Ghaloustian, No. 2:19-CR-00714-PA (C.D. Cal. May
21, 2020), dkt. 60; United States v. Green, No. 2:19-CR-217-JFW (C.D. Cal. June 5, 2019), dkt.
37; United States v. Arnold, No. 2:17-00044-MWF (C.D. Cal. July 18, 2018), dkt. 160.

Finally, in response to defendant's request for a Daubert hearing, the government
contends that the Court can properly fulfill its gatekeeping function at trial and that a separate
hearing to assess Agent Gertler's reliability is not necessary.  Dkt. 69 at 15.  The government

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

argues that Agent Gertler's experience and qualifications "are not reasonably in dispute" and notes that courts in this district have allowed Agent Gertler to testify on substantially similar topics without a <u>Daubert</u> hearing. <u>Id.</u> (citing <u>Jolly</u>, No. 2:20-CR-00438-MCS, dkt. 111, at *6; <u>Ghaloustian</u>, No. 2:19-CR-00714-PA, dkt. 60, at *3).

As an initial matter, the Court considers whether the government has complied with its obligations under Federal Rule of Criminal Procedure 16, ("Rule 16"), despite its delayed disclosure of information regarding Agent Gertler's experience.

Rule 16 provides that "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial," and that the summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). In evaluating the sufficiency of notice pursuant to Rule 16, courts ask whether the notice provided the defendant "with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." <u>United States v. Mendoza-Paz</u>, 286 F.3d 1104, 1111 (9th Cir. 2002) (quoting Fed. R. Crim. P. 16, 1993 amend. advisory committee's note).

Here, trial is set for September 13, 2022. On June 22, 2022, almost three months before trial, the government notified the defense that Agent Gertler would testify and identified the topics that Agent Gertler's testimony would cover, which are topics routinely discussed in similar cases. On August 22, 2022, over three weeks before trial, the government sent the defense the *curriculum vitae* and supplemental disclosures detailing Agent Gertler's experience. However, aside from notifying defendant that Agent Gertler would not testify about one of the subjects listed in June, there was no change to the topics covered by the proposed testimony. As such, the amount of time between the government's disclosures and the trial is sufficient for the defense to prepare for cross-examination, and the inadvertent delay has not prejudiced defendant. <u>See</u> <u>Mendoza-Paz</u>, 286 F.3d at 1111 (upholding notice of narcotics expert's testimony twelve days before trial and provision of expert's resume and report eight days before trial).

The Court next considers whether Agent Gertler's testimony satisfies the requirements of Federal Rule of Evidence 702. The government has provided a lengthy summary of Agent Gertler's qualifications, including his 25 years in law enforcement and his experience intercepting over one hundred drug-trafficking suspects. As the government points out, Agent Gertler has previously testified as an expert on similar topics, and the Ninth Circuit has held similar expert testimony to be admissible. <u>See, e.g.</u>, <u>Freeman</u>, 498 F.3d at 901 n.1 (upholding expert testimony of police officer who had participated in over one hundred narcotics

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                 **'O'**

investigations and, based on that experience, "was qualified to offer expert testimony regarding the meaning of encoded drug jargon"). In light of Agent Gertler's extensive experience investigating narcotics activity and the fact that he has testified on substantially similar topics in the past, the Court concludes that Agent Gertler's testimony, to the extent that it covers the topics indicated by the government and does not invade the province of the jury, complies with Rule 702. At trial, the government will elicit information on Agent Gertler's training and experience qualifying him to testify as an expert, at which time the defense will be free to raise any objections and cross-examine him regarding the same.

Based on this conclusion that Agent Gertler is qualified to provide expert testimony on narcotics activity, the Court finds that a <u>Daubert</u> hearing is not necessary. <u>See</u> <u>United States v. Alatorre</u>, 222 F.3d 1098, 1105 (9th Cir. 2000) (concluding that pretrial hearing was not necessary before admission of agent's testimony on the value of marijuana where agent had "twelve years of experience" and "specialized training"). Defendant will have the opportunity "to explore the relevance and reliability of the proposed testimony" at trial. <u>Id.</u> Accordingly, the Court **DENIES** defendant's motion to the extent it is based on Federal Rule of Evidence 702.

### 2.   <u>Defendant's Confrontation Clause Argument</u>

Next, defendant argues that admission of Agent Gertler's testimony would violate the Confrontation Clause of the United States Constitution. Dkt. 62 at 5.

#### a.   *Legal Standard*

Under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), a defendant's Confrontation Clause rights are violated by the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had ... a prior opportunity for cross-examination." <u>Id.</u> at 53–54. Accordingly, "there is generally no <u>Crawford</u> problem when an expert 'appli[es] his training and experience to the sources before him and reach[es] an independent judgment.'" <u>United States v. Reyes Vera</u>, 770 F.3d 1232, 1237 (9th Cir. 2014) (quoting <u>United States v. Gomez</u>, 725 F.3d 1121, 1129 (9th Cir. 2013)) (alterations in original). "But an expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he 'is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.'" <u>Id.</u> (quoting <u>Gomez</u>, 725 F.3d at 1129).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                              **'O'**

    *b. Analysis*

Defendant contends that Agent Gertler's testimony would run afoul of the Confrontation Clause because it would "preclude Mr. Quintero's ability to challenge and confront the witnesses that provided information to Gertler about specific aspects of drug distribution." Dkt. 62 at 5. Defendant further contends that the Court will be unable to determine whether Agent Gertler's interpretation of information he has gathered from past investigations and interviews is "accurate, representative, or biased." Id. at 6.

In response, the government asserts that, because Agent Gertler would offer his own independent judgment based on his training and experience, his testimony would not violate the Confrontation Clause. Id. at 13. The government argues that this is not a case where the expert testimony "is 'used as little more than a conduit or transmitter for testimonial hearsay.'" Id. (quoting Reyes Vera, 770 F.3d at 1237). Rather, according to the government, this case is analogous to Reyes Vera, in which the court rejected the claim that an expert violated the Confrontation Clause because he imparted testimonial facts gathered from his observations of gang members without applying independent analysis. Id. at 13-15; see Reyes Vera, 770 F.3d at 1239. The Reyes Vera court determined that the testimony was admissible because "the expert imparted the testimonial information to explain 'the basis for his expert opinion' and applied 'his expertise to explain the meaning of a recorded call.'" Dkt. 69 at 14 (quoting Reyes Vera, 770 F.3d at 1239). Additionally, the government states that defendant's characterization of Agent Gertler's testimony as based on unidentified and undisclosed information is false and that Agent Gertler's testimony is based on his training and expertise, as described in the government's disclosures. Id.

So long as Agent Gertler offers his independent judgment and does not simply impart statements made by persons not testifying in court, defendant's Confrontation Clause rights are not violated. See Reyes Vera, 770 F.3d at 1237. The Court notes that, at trial, the defense will have the opportunity to cross-examine Agent Gertler and to question him regarding whether the information underlying his testimony is reliable. Accordingly, the Court **DENIES** defendant's motion to the extent it is based on his Confrontation Clause rights.

## IV.   CONCLUSION

In accordance with the foregoing, the Court **DENIES** defendant's motion to suppress, dkt. 54, **DENIES** defendant's motion to conduct attorney-led *voir dire* of an hour per side, dkt. 53, **DENIES** defendant's motion to sever counts, dkt. 63, **DENIES** defendant's motion *in*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    **'O'**

*limine* to exclude evidence of the DEA investigation, dkt. 61, and **DENIES** defendant's motion *in limine* to exclude expert testimony, dkt. 62.[5]

IT IS SO ORDERED.

|                      |      01       |   :   |      50       |
|----------------------|---------------|-------|--------------|
| Initials of Preparer |               | CMJ   |              |

---

[5] Additionally, defendant filed a motion *in limine* on August 23, 2022, to exclude to anticipated testimony from B.M. relating to certain statements she made to the Long Beach Police Department on May 16, 2019.  Dkt. 72.  The Court **RESERVES JUDGMENT** on this motion pending any government objection to the motion.