UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**  'O'

| Case No. | 2:19-cr-00766(B)-CAS | | Date | January 26, 2023 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |

| Catherine Jeang | Marea Woolrich | Christopher Kendall |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant: | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| CRUZ NOEL QUINTERO | X | X | | MARK KASSABIAN | X | | X |

**Proceedings:** ORDER ON DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL (Dkt. 170, filed on November 7, 2022)

## I.   INTRODUCTION AND BACKGROUND

Defendant Cruz Noel Quintero is charged with one count of distribution of fentanyl resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count One); one count of possession of machineguns, in violation of 18 U.S.C. § 922(o) (Count Two); two counts of possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d) (Counts Three and Four); one count of maintaining a drug involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count Five); and one count of possession of firearms in furtherance of a drug-trafficking crime, in violation of 21 U.S.C. § 924(c)(1)(A) (Count Six). Dkt. 57. Count One arises from defendant's alleged distribution of fentanyl to his coworker, B.M. Dkt. 103 at 1. The government alleges that defendant sold B.M. a bag of white powder, which defendant stated was $100 worth of cocaine but that was actually fentanyl. Id. The government further alleges that, the following morning, B.M. and her fiancé S.F. used the fentanyl, believing it be cocaine, and that S.F. died as a result of ingesting the fentanyl supplied by defendant. Id. The remaining counts charged against defendant arise out of defendant's alleged possession and use of firearms and drug trafficking paraphernalia at his residence located at 160 East 49th Street in Long Beach, California (the "49th Street Residence"). Id. The government alleges that one of the primary purposes of the 49th Street Residence was to manufacture and distribute controlled substances, including cocaine and methamphetamine, and that defendant possessed six firearms in furtherance of maintaining the premises. Id. at 1-2.

Defendant's trial began on September 13, 2022. Dkt. 129. At trial, the government called 19 witnesses and introduced 119 exhibits into evidence, including text messages and other electronic communications, recordings of intercepted phone calls, photographs, cell-site

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**　　　　　　　　'O'

location data, call detail records, and business records. Dkt. 142. The defense called one witness, an officer of the Long Beach Police Department ("LBPD"). Dkt. 166. The jury began deliberations on September 21, 2022, and returned a verdict later that day, finding defendant guilty on all counts. Dkt. 135. On the special verdict form, the jury specifically found that S.F.'s death resulted from defendant's distribution of fentanyl. Dkt. 143.

At the close of the government's case and before the case was submitted to the jury, defendant timely moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. Dkt. 166; see Fed. R. Crim. P. 29(a). On September 21, 2022, defendant renewed his Rule 29 motion. Dkt. 167. The Court reserved judgment and set a briefing schedule on the Rule 29 motion. Dkt. 135. On November 7, 2022, defendant filed a Rule 29 motion for acquittal. Dkt. 170 ("Mot."). On November 21, 2022, the government filed an opposition to defendant's motion. Dkt. 174 ("Opp."). Defendant's Rule 29 motion is now before the Court.

On January 25, 2023, the Court held a hearing on defendant's Rule 29 motion for a judgment of acquittal. Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II.    LEGAL STANDARD

Rule 29 provides that, after a jury returns a guilty verdict, a "court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c). Courts reviewing a motion for judgment of acquittal under Rule 29(c) apply the same test as they do in evaluating a challenge to the sufficiency of the evidence. United States v. Ladum, 141 F.3d 1328, 1337 (9th Cir. 1998). When considering a motion for judgment of acquittal, courts must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Hursh, 217 F.3d. 761, 767 (9th Cir. 2000). This is a two-step process: "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010). "Second, ... the reviewing court must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original). "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010). "[A]ny conflicts in the evidence are to be resolved in favor of the jury's verdict." United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201–02 (9th Cir. 2000).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**　　　　　'O'

## III.　DISCUSSION

Defendant moves for a judgment of acquittal on all counts. Mot. at 2. In its opposition, the government argues that the evidence amply supports the jury's verdict. See generally Opp. The Court addresses each count in turn.

### A.　Count One: Distribution of Fentanyl Resulting in Death

Defendant argues that there is insufficient evidence to support his conviction on Count One, distribution of fentanyl resulting in death. Mot. at 2.

Count One required the government to prove that (1) defendant knowingly distributed fentanyl; (2) defendant knew it was fentanyl or some other federally controlled substance; and (3) defendant's distribution of fentanyl resulted in S.F.'s death. See 21 U.S.C. §§ 841(a)(1), (b)(1)(c). See also dkt. 138 ("Jury Instructions") Nos. 17-18. Defendant's distribution of fentanyl "resulted in" death if it was the "cause in fact of [S.F.'s] death. That is, the government [was required to] prove beyond a reasonable doubt that but for [S.F.'s] use of the distributed fentanyl, he would not have died." Jury Instructions No. 18. See Burrage v. United States, 571 U.S. 204, 214, 218-19 (2014) (holding that the "death resulting" penalty enhancement pursuant to 21 U.S.C. § 841(b)(1)(c) requires establishing "but for" causation). The jury instructions on Count One clarified that "if [S.F.'s] use of fentanyl combined with other factors . . . to produce death, and death would not have occurred without the incremental effect of the fentanyl, his use of fentanyl 'resulted in' his death." Jury Instructions No. 18.

In his motion for judgment of acquittal, defendant argues that the government did not meet its burden because there is insufficient evidence that defendant sold fentanyl, and not cocaine, to B.M. Mot. at 2. Rather, defendant contends, the evidence at best shows that defendant sold B.M. cocaine. Id. at 3. Specifically, defendant argues, text messages sent between defendant and B.M. the night before S.F.'s death referenced cocaine, not fentanyl, and a Drug Enforcement Agency price sheet indicated that the price and quantity of the drugs B.M. purchased from defendant were consistent with cocaine. Id. Defendant additionally points out that B.M. and S.F. had purchased and received drugs from several other individuals, and, the day that S.F. died, numerous controlled substances purchased from other suppliers, including MDMA, ecstasy, Adderall, Klonopin, Vyvanse, psychedelic mushrooms, and acid, were found at their apartment. Id. at 3-4. Defendant further argues that no evidence showed or supported an inference that defendant was a fentanyl user or dealer because no fentanyl was found in his home or in his possession and none of defendant's text messages relating to drug distribution referenced fentanyl in plain or coded language. Id. at 3.

Defendant additionally argues that, even if the evidence shows that defendant sold fentanyl to B.M., there is insufficient evidence to conclude that the fentanyl caused S.F.'s death.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES – GENERAL            'O'

Mot. at 3.  Defendant points out that the medical examiner and toxicologist did not have access to S.F.'s medical history and that the medical examiner did not test for all drugs that could have been in S.F.'s system.  Id. at 4.  According to defendant, "it is unknown what other drugs S.F. had consumed (historically or recently) that could have contributed to his death."  Id.

The Court finds that the government introduced sufficient evidence at trial to support a rational finding that the white-powder substance that B.M. and S.F. used on the morning of S.F.'s death was the substance defendant sold to B.M.  B.M. testified that defendant gave her a "bag of what [she] thought was cocaine" and that they "each did some of it" in the kitchen the next morning.  Dkt. 165 at 65:22-25, 68:3-5.  Additionally, the government introduced a photograph depicting a rolled-up dollar bill, a credit card, a bag, and a white-powder substance on the kitchen counter, which B.M. testified was the substance she had purchased from defendant the night before S.F.'s death and the substance that she and S.F. had used in the morning.  Dkt. 165 at 68:22-69:14, 75:2-4.  When asked if there was "any doubt in her mind" whether the substance that she and S.F. ingested came from defendant, B.M. said "No, no doubt."  Dkt. 165 at 82:6-13.

Furthermore, the government introduced B.M.'s phone records, which showed that B.M. called defendant after she discovered that S.F. had no pulse and deleted text messages with defendant, but no other text messages concerning drug-activity, from her phone.  Exh. 122.  B.M. testified that she thinks she did this "because [she] was nervous and [she] knew that [she] had bought drugs from [defendant] that [] killed [her] boyfriend."  Dkt. 165 at 78:5-9.  The government additionally adduced evidence indicating that defendant was the only source of cocaine available to B.M. and S.F., including a text message from B.M. to S.F. saying, "oh well, no coke," when B.M. had not heard back from defendant, dkt. 165 at 43:3-14, and cell-site data showing that B.M. and S.F. waited over an hour to pick up what they believed was cocaine from defendant and then drove home and remained there until the morning, dkt. 155 at 53:9-56:21; 58:3-59:6.

From this evidence, a rational factfinder could reasonably conclude that defendant sold B.M. a white-powder substance and that B.M. and S.F. used that substance the next morning.  The government additionally introduced sufficient evidence to support a reasonable finding that the substance was fentanyl, as jurors heard testimony from forensic scientist Gregory Gossage that he tested the white-powder substance and "found that the substance contained fentanyl, not cocaine."  Dkt. 156 at 20:2-23; 29:5-8.

Contrary to defendant's contention, the government did introduce evidence that defendant was familiar with fentanyl or possessed fentanyl, even though no fentanyl was discovered in defendant's residences.  For example, an LBPD detective testified that, when asked whether a wrapped package of a white substance found in defendant's residence was

cocaine or fentanyl, defendant replied "[h]e wasn't sure which one it was." Dkt. 154 at 89:17-20. The fact that defendant did not know whether the package found in his residence was cocaine or fentanyl creates the inference that what he was distributing could have been fentanyl.

Relatedly, defendant argues that the government introduced evidence, including text messages and photographs on defendant's phone, indicating that defendant was distributing cocaine and methamphetamine. Mot. at 3. According to defendant, this evidence supports the conclusion that defendant distributed cocaine and methamphetamine, not fentanyl. Id. However, the government adduced extensive evidence, including text messages from customers and accompanying expert testimony, indicating that defendant distributed adulterated drugs on multiple occasions. Exhs. 175-76; opp. at 17. The fact that defendant was distributing adulterated drugs demonstrates that defendant, on other occasions, distributed drugs without reference to what compounds they contained and undermines defendant's contention that the absence of explicit references to fentanyl in defendant's communications means that he never distributed fentanyl. Accordingly, the evidence that defendant distributed substances that could contain fentanyl suffices to reasonably demonstrate that defendant distributed fentanyl, even though no fentanyl was found in his possession or referenced in his communications.

Finally, several pieces of evidence support the finding that S.F. would not have died but for the use of fentanyl distributed by defendant, including the testimony of two toxicologists that the only drug found in S.F.'s blood was fentanyl, dkt. 155, 72:17-73:4; 73:20-74:9; 37:24-38:1, and that S.F.'s "cause of death was fentanyl toxicity," id. at 38:14-39:1. Another medical toxicologist testified that, based on the autopsy and toxicology reports, he agreed that S.F. died of a fentanyl overdose. Id. at 94:13-95:4. When asked if he needed S.F.'s full medical history to determine his cause of death, the medical toxicologist answered that he did not and that if S.F. had underlying medical issues, they would have been identified during the autopsy. Id. at 100:20-102:4. Based on this evidence, a rational factfinder could conclude, beyond a reasonable doubt, that the fentanyl caused defendant's death.

Accordingly, viewing the evidence in the light most favorable to the government, the Court concludes that a rational trier of fact could find that defendant distributed fentanyl and that defendant's distribution of fentanyl resulted in S.F.'s death.

### B.  Count Two: Possession of Unregistered Machineguns

Defendant next contends that there is insufficient evidence to support his conviction on Count Two, possession of unregistered machineguns, in violation of 18 U.S.C. § 922(o)(1). Mot. at 4.

Count Two required the government to prove that (1) defendant possessed a machinegun and (2) defendant knew that the firearm was a machinegun. See 18 U.S.C. § 922(o)(1); see also

Jury Instructions No. 19.  The term "machinegun" includes "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b); see also Jury Instructions No. 19.  "The 'designed' definition includes weapons which have not previously functioned as machineguns but possess specific machinegun design features which facilitate automatic fire by simple alteration or elimination of existing component parts."  Jury Instructions No. 19.  The jury was instructed that "[k]nowledge that the firearm is a machine gun may be inferred if a visual inspection of the firearm would alert a reasonable person that it is capable of automatic fire."  Jury Instructions No. 19.

Defendant argues that the government failed to prove beyond a reasonable doubt that defendant knew that the firearms at issue in Count Two—the Uzi-type firearm and the State Factory 66 firearm—had characteristics that rendered them machineguns.  Mot. at 4.  Specifically, defendant contends that no evidence showed that defendant "inspected, fired, or handled those firearms," discussed those firearms in particular with law enforcement, or had those firearms at his residence for any particular length of time.  Id. at 4-5.

At trial, the jury heard testimony from LBPD officers describing the machineguns that they located in defendant's residences and stating that defendant told one officer that all of the firearms belonged to him, that "he loved guns," and that he bought the guns "from friends off the street."  Dkt. 153 at 26:4-35:2; dkt. 154 88:22-24.  Jurors additionally heard testimony from ATF Firearms Enforcement Officer James Barlow regarding the visible external features of the charged firearms that identify them as machineguns—specifically, the three-position selector above the trigger, which allows the firearm user to toggle between safety, semi-automatic, and automatic settings with audible clicks.  Dkt. 164 at 62:18-23, 64:2-66:9; 71:15-72:17.  Officer Barlow additionally described the three-position selector as a "dead giveaway" that a firearm is a machinegun and compared the machineguns to defendant's semi-automatic rifles, pointing out that their selectors only had two positions, safety and semi-automatic.  Id. at 68:5-9; 66:9-68:9.  Finally, the government introduced numerous photographs of defendant pointing and holding some of the firearms found at the 49th Street Residence, including photographs of firearms attached to high-capacity magazines.  Exhs. 158-60; dkt. 156 at 61:13-63:5.

A rational factfinder could interpret this evidence to show, beyond a reasonable doubt, that defendant was familiar with firearms, handled and used his firearms, and knew that the firearms charged in Count Two were machineguns.  The government was not required to present evidence proving that defendant did in fact use and fire the firearms charged in Count Two.  See United States v. Rambo, 74 F.3d 948, 955 (9th Cir. 1996) (upholding finding that defendant knew real nature of firearm silencer where "government's expert witness testified that the design of a silencer is sufficient to make someone aware of its nature" and explaining that "proof of actual use is not required").  Accordingly, as defendant does not challenge the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES – GENERAL       'O'

sufficiency of the evidence regarding the other elements of Count Two, the Court finds that, when viewed in the light most favorable to the government, the evidence supports a rational finding that defendant possessed unregistered machineguns, in violation of 18 U.S.C. § 922(o)(1).

### C.   Counts Three and Four: Possession of Unregistered Short-Barreled Rifles

Defendant argues that there is insufficient evidence to convict him on Counts Three and Four, possession of unregistered short-barreled rifles, in violation of 26 U.S.C. § 5861(d).

Section 5861(d) requires the government to prove that (1) defendant knowingly possessed an AR15-style semiautomatic rifle, with unknown manufacturer, with a barrel shorter than 16 inches in length, bearing no serial number; (2) defendant was aware that this firearm had a barrel of less than 16 inches in length; and (3) defendant had not registered the firearm with the National Firearms Registration and Transfer Record.  See Jury Instructions No. 20. The government was not required to prove that defendant knew that possessing the firearm was illegal.  Id.

In his motion, defendant argues that there is insufficient evidence to establish that defendant knew the two AR-15-style firearms charged in Counts Three and Four were short-barreled rifles.  Mot. at 5.  Defendant states that he did not discuss those firearms in any text messages introduced by the government, and there is no evidence that he handled them.  Id.

The Court finds that the evidence adduced at trial was adequate for a rational factfinder to conclude, beyond a reasonable doubt, that defendant knew the firearms were short-barreled rifles.  The government introduced photographs and testimony indicating that the firearms charged in Counts Three and Four were loaded when they were found, dkt. 154 at 17:4-14; 84:12-19, which could be interpreted as evidence that defendant was familiar with the firearms and their characteristics.  Moreover, Officer Barlow testified that the barrels of the short-barreled rifles measured 7 and 5/8 inches and 8 and 5/8 inches.  Dkt. 164 at 51:6-13; 54:13-21. Officer Barlow compared the length of these rifles to the length of defendant's regulation-size rifle with a barrel of 16 inches, roughly two times the length of the barrels of the charged rifles. Id. at 58:1-59:9.  The jury additionally saw photographs on defendant's phone of his firearms placed next to household objects, seemingly to measure their size.  Dkt. 163 at 78:7-79:9.  This evidence, in addition to the evidence described above with respect to Count Two indicating defendant's familiarity with firearms, when viewed in the light most favorable to the government, supports a rational conclusion that defendant knew that the charged rifles had barrels shorter than 16 inches.

Defendant does not challenge the sufficiency of the evidence as to the other elements of Counts Three and Four.  See Mot. at 5.  Therefore, the Court concludes that, based on the

evidence presented, a rational jury could find that defendant possessed unregistered short-barreled rifles, in violation of 26 U.S.C. § 5861(d).

### D. Count Five: Using and Maintaining a Place for Purpose of Manufacturing and Distributing Cocaine and Methamphetamine

Defendant next argues that there is insufficient evidence to support his conviction on Count Five, knowingly and intentionally using or maintaining a place for the purpose of manufacturing or distributing a controlled substance, in violation of 21 U.S.C. § 856(a)(1).

Count Five requires the government to prove that defendant knowingly used or maintained a place for the purpose of manufacturing or distributing a controlled substance. See 21 U.S.C. § 856(a)(1); see also Jury Instructions No. 22. "For the purpose of manufacturing or distributing a controlled substance" means that manufacturing or distributing a controlled substance "is one of the primary or principal uses to which the residence is put." Jury Instructions No. 22. To establish that defendant has maintained such a residence, the jury could rely on "facts showing that over a period of time, the defendant directed the activities of and the people in the place." Id.

According to defendant, the 49th Street Residence "was furnished, lived-in, and obviously occupied as a home by himself and his family members." Mot. at 5. Defendant contends that there is no evidence that one of the primary purposes of this residence was to manufacture cocaine or methamphetamine. Id. at 5. Specifically, defendant points out that no testimony at trial discussed the manufacturing of cocaine or methamphetamine and no physical evidence indicative of drug manufacturing, such as drug precursors or recipes, were found in defendant's home. Id. at 5-6. As to distribution, defendant argues that police found only "small personal use quantities of methamphetamine and heroine" at defendant's home, and no evidence established that defendant sold cocaine or methamphetamine out of his home. Id. at 6.

The Court finds these arguments to be unpersuasive. At trial, the government introduced photographs of and testimony describing various drug-trafficking paraphernalia discovered at the 49th Street Residence, including a hydraulic press to create bricks of cocaine, pounds of cutting agents, vacuum sealing devices, digital scales, unused sandwich baggies, a pay-owe book, eight burner phones, and firearms. Exhs. 60-63, 67; dkt. 153 at 41:9-42:23, 42:24-44:10; dkt. 154 at 21:12-26:3. The jury additionally heard testimony from an LBPD officer explaining how these paraphernalia are used in the drug-trafficking trade. Dkt. 154 at 21:12-26:3. For example, the officer testified that a hydraulic press can create kilos of cocaine and that vacuum sealing devices are commonly used "to prepare larger quantities of narcotics" for distribution. Id. The jury additionally heard testimony from Special Agent Connie Gerten stating that she traced intercepted phone calls, which discussed cocaine shipments, to the 49th Street Residence and that one of the phones used for the intercepted phone calls was found at the residence and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**                    'O'

contained images of cocaine, as well as text messages indicating that defendant was selling cocaine.  Dkt. 163 at 69:21-74:2; 76:14-80:9; Exhs. 11, 14-16, 19.  These photographs and testimony could reasonably be interpreted as evidence that one of the primary uses of the 49th Street Residence was the distribution of drugs.

Contrary to defendant's argument, the government was not required to show that drugs in quantities characteristic of distribution were found at defendant's residence.  The extensive evidence of drug-trafficking paraphernalia and accompanying testimony, as well as the intercepted phone calls tracing drug deals to the 49th Street Residence, provided the jury with sufficient evidence to reasonably conclude that the residence was used for the purpose of drug distribution.  See United States v. Basinger, 60 F.3d 1400, 1406 (9th Cir. 1995) (finding sufficient evidence that defendant maintained shed for the purpose of manufacturing, distributing, or using methamphetamine, in light of "extensive and obvious methamphetamine manufacturing paraphernalia in the [] shed" and evidence that defendant "on a previous occasion had been found in possession of methamphetamine and [] an essential chemical" for methamphetamine production).

The government additionally argues that the jury was provided with a reasonable explanation as to why large quantities of drugs were not found at the 49th Street Residence that is consistent with the residence's use as a drug distribution premises.  Specifically, the government points out that it introduced text messages showing that, several hours before the search of his residences, defendant learned that S.F. had died from an overdose and that S.F. and B.M. were dating.  Exhs. 187, 188; dkt. 156 at 70:19-74:19.  These messages, according to the government, could reasonably support the inference that defendant knew that he would be investigated in connection with S.F.'s death, anticipated that his residences would be searched, and disposed of drugs in his residence accordingly.  Regardless of whether the jury in fact drew this inference, the Court finds that the government adduced ample evidence that the 49th Street Residence was maintained for the purpose of drug distribution, in light of the extensive drug-trafficking paraphernalia, drug proceeds, and firearms found in the residence and the intercepted phone calls traced there.

In short, the government introduced sufficient evidence to support the jury's finding that distribution of drugs was a primary purpose of the 49th Street Residence.  As defendant does not challenge the sufficiency of the evidence with respect to any of the other elements of Count Five, the Court concludes that the evidence supported a rational finding beyond a reasonable doubt that defendant violated 21 U.S.C. § 856(a)(1).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES – GENERAL        'O'

### E. Count Six: Possession of Firearms in Furtherance of a Drug-Trafficking Crime

Finally, defendant argues that there is insufficient evidence to convict him on Count Six, possession of firearms in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c). Mot. at 6.

Count Six required the government to prove beyond a reasonable doubt that (1) defendant committed the crime of using or maintaining a drug-involved premises, as charged in Count Five; (2) defendant knowingly possessed one or more firearms; and (3) defendant possessed the firearm or firearms in furtherance of the crime of using or maintaining a drug-involved premises. Jury Instructions No. 23. The jury was instructed that a person "possesses" a firearm "if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it." Id.

Defendant argues that, in addition to failing to provide sufficient evidence on Count Five (the first element of Count Six), the government failed to prove beyond a reasonable doubt that possession of the firearms was "in furtherance" of the crime. Mot. at 7. Defendant cites United States v. Rios, 449 F.3d 1009 (9th Cir. 2006) for the rule that the government "must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote criminal activity." Id. at 1013. According to defendant, the testimony presented by the government that drug dealers would want to have firearms accessible to protect themselves, their cash, or their drugs is not sufficiently specific to show that defendant possessed firearms to advance or promote the drug crime alleged in Count Five. Mot. at 7.

The evidence introduced at trial to support a conviction on Count Six included LBPD officer testimony that he found numerous firearms, some of which were loaded, in a closet with drug proceeds and in an adjacent closet with large quantities of a cutting agent and smaller quantities of narcotics   Dkt. 154 at 9:6-21:11; dkt. 153 at 29:22-30:18; 32:20-33:18. The jury additionally heard testimony from Special Agent Jason Gertler that, in his experience, drug traffickers using drug-involved premises often possess firearms to "protect their money, their profit" and "themselves." Dkt. 166 at 34:13-22.

The Ninth Circuit has explained that the location of guns in close proximity with drug proceeds and other tools of the drug-trafficking trade can support a finding that the guns were possessed in furtherance of a drug offense. See United States v. Krouse, 370 F.3d 965, 968 (9th Cir. 2004) (finding sufficient evidence for § 924(c) conviction where five firearms "were strategically located within easy reach in a room containing a substantial quantity of drugs and drug trafficking paraphernalia"); United States v. Hector, 474 F.3d 1150, 1158 (9th Cir. 2007) (explaining that nexus between gun and drug crime necessary for § 924(c) conviction was met

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**      'O'

where loaded gun was found "within [defendant's] easy reach, near the entryway where the drugs were sold, and on the path to where the drugs were stored").

Here, where the government adduced evidence that numerous firearms, including loaded firearms, were located within close proximity of drug proceeds and other drug-trafficking paraphernalia, a jury could reasonably conclude that the firearms were possessed in furtherance of a drug crime. Defendant's argument that the government failed to present specific facts tying the firearms to the drug crime ignores the photographs and testimony showing that the firearms were within easy reach of the drug proceeds. And the case on which defendant relies, Rios, 449 F.3d 1009, is inapposite. In Rios, the Ninth Circuit concluded that generalized expert testimony that drug traffickers often use firearms for protection was not sufficient to establish the "in furtherance" element of § 924(c). 449 F.3d at 1014. However, Rios is distinguishable because, in that case, no firearm was found at the location of the underlying drug crime and thus "the firearm was not readily accessible to Rios when he would have been involved in drug conspiracy activities for which possession of a gun would be useful." Id. at 1016. Here, by contrast, the firearms were located at the 49th Street Residence—that is, the residence maintained for the purpose of drug distribution as alleged in Count Five—and within easy reach of the drug proceeds.

Accordingly, having already found that the evidence supported a finding that the first element of Count Six was met, the Court concludes that the government adduced sufficient evidence for a rational factfinder to conclude, beyond a reasonable doubt, that defendant possessed firearms in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c).

## IV. CONCLUSION

In accordance with the foregoing, the Court **DENIES** defendant's motion for acquittal. The Court refers the defendant to the Probation Office for an investigation and Pre-sentence Report and continues the matter to **May 15, 2023**, at **2:30 P.M.** for sentencing.

IT IS SO ORDERED.

|  | 00 | : | 15 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |